Richmond

CHESAPEAKE FERRY COMPANY AND DeWITT C. ELDREDGE
v. J. L. HUDGINS.

January 15, 1931.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

876

*W. R. L. Taylor*, for the plaintiffs in error.

*Wm. G. Maupin* and *James E. Heath*, for the defendant in error.

EPES, J., delivered the opinion of the court.

J. L. Hudgins brought his action for slander in the Circuit Court for the city of Norfolk against Chesapeake Ferry

Company and DeWitt C. Eldredge, its general manager. The declaration contained two counts. One charges slander under the common law. The other charges the use of insulting words under section 5781, Virginia Code 1919.

The language charged is the same in both counts, to-wit, that on November 15, 1927, DeWitt C. Eldredge, in his capacity as superintendent of the Chesapeake Ferry Company, and in the course of his employment, spoke the following words (the innuendoes alleged are omitted):

"Captain Hudgins on one occasion was so drunk while on duty that he was obliged to go to his room and go to bed. He was in the habit of drinking and was under the influence of liquor on duty from time to time. He on one occasion had a woman in his room for several hours and was so boisterous as to be offensive to others on board the boat."

The declaration alleges that said slanderous words were spoken "in the presence and hearing of said plaintiff and divers other persons, and was in consequence thereof published, communicated, conveyed, and made known to the public generally and especially to the members of the union of which said plaintiff was and is a member, and to the officers thereof and to the owners of steam vessels plying on the Chesapeake Bay and its tributaries."

The plaintiff further alleges that said words were authorized by the Chesapeake Ferry Company "previous to the utterance thereof, and after said utterance, ratified, approved and concurred in by the said defendant."

The defendants plead the general issue, and filed their gounds of defense, stating that they would "rely upon privilege, the non-abuse thereof, and lack of malice."

The jury returned a verdict for the plaintiff against both defendants for $7,057.15 damages, in accordance with which the court entered judgment. The defendants assign error.

As the main contention of the defendant in error is that actual malice is properly to be inferred from the evidence,

we shall, at the expense of brevity, in stating the facts endeavor to set out all the facts and testimony which he contends support such an inference.

Chesapeake Ferry Company is a public service corporation which operates a line of ferries between Norfolk and Newport News, Virginia. At the time here in question, John H. Rodgers was president of the company, DeWitt C. Eldredge was general manager, and H. L. Herman was its special agent or investigator. Eldredge had been with the company since September, 1925; with the exception of about three months in 1926. Herman had been employed by the company as its special agent and investigator for an unidentified length of time, but apparently for several years.

J. L. Hudgins, who was sixty-three years old, and holds, and has held for many years, a master mariner's license, was employed by said company as mate on the company's steamer "Chesapeake," which was commanded by Captain Morrissette. He had been regularly so employed for about eighteen months prior to October 29, 1927, and before that time, from about 1921, had been employed by the company as an extra man. His salary as mate was $170 per month and subsistence.

The steamer carried two pursers. One, a Mr. White, who had charge of automobiles, and the other, known as the "turnstile" purser, who had charge of foot passengers. When at the terminals, these pursers, and not the captain, had authority as to what persons had paid their fares and were entitled to enter and receive transportation on the ship.

On the afternoon of October 29, 1927, Captain Morrissette was eating his supper at the time the ship left Norfolk for Newport News, and Hudgins was in charge. As the officer in charge, it was Hudgins' duty to see that the pursers were aboard before leaving the terminal. When the ship docked at Newport News it was found that the "turnstile"

purser had been left on the wharf in Norfolk. In his testimony Hudgins, with reference to this, says: "I didn't see the 'turnstile' purser come aboard. I saw the other one come aboard and I hollered down before leaving and asked the deck hands if both pursers was aboard and they told me they was. I naturally supposed they was. He had ample time to get aboard so I rang the boat ahead and proceeded to Newport News."

The testimony of Eldredge on this point is that when he investigated this matter on the next day, Hudgins "told me some one said 'all right' and he went off. He didn't tell me that any one had told him the pursers were aboard. He said he thought the pursers were aboard."

Before the ship docked at Newport News, Captain Morrissette had resumed command. At Newport News a crowd of several hundred foot passengers were waiting to take this ship on its return trip to Norfolk. No one on the ship had a key to the turnstile through which foot passengers were admitted to the ship, and the automobile purser refused to permit these foot passengers to get on the ship, for fear he could not collect the fares. Captain Morrissette seems to have made no effort to get the automobile purser to permit the foot passengers to get on; but Hudgins testifies that he urged both the captain and the purser to take these passengers aboard, and this is not contradicted. The ship put off for Norfolk without these passengers, which occasioned much complaint and criticism.

Special Agent Herman was in Newport News and a protest was made to him. Upon the return of the ship to Newport News that night, Herman came aboard and requested Hudgins and White, the automobile purser, to go with him to Norfolk to the office of the company, which they did; and there Herman, in the presence of Hudgins, reported the occasion to Taylor, the paymaster and clerk on duty.

The next morning Hudgins was ordered to report to Eldredge, along with the others involved, for an investigation of this matter. As a result of this investigation Eldredge took the view that Hudgins had been derelict in his duty in not seeing that the "turnstile" purser was aboard before leaving Norfolk; that White had used bad judgment in not allowing the foot passengers to come aboard; and that Captain Morrissette was also culpable in not attempting to get the automobile purser to permit these passengers to come aboard, and in sailing without them. The next day, October 31st, Eldredge discharged Hudgins and White, and suspended Morrissette for ten days without pay.

The only evidence as to any prior difficulty or friction between Eldredge and Hudgins is that about a year prior to this time Hudgins, along with the other employees on the "Chesapeake," had some difference with Eldredge with reference to pay for overtime work. But this matter was satisfactorily adjusted, and the testimony of Hudgins himself shows that Eldredge never manifested any signs that he harbored any ill will towards him on account of this incident. It is further shown by Eldredge's testimony and other evidence in the record that Eldredge did not harbor any ill feeling on account of this incident.

Hudgins felt that he had been too severely disciplined for sailing without the "turnstile" purser, for which he contends he was not at fault, and he requested the Masters, Mates and Pilots Association, a labor organization of which he was a member, to intercede for him, and attempt to secure his reinstatement. This organization appointed Captain J. Ira Hodges and Captain George B. Downing as a committee to confer with Eldredge with reference to this matter.

This committee had four conferences with Eldredge with reference to the matter and both Captain Downing and Captain Hodges testify that in these conferences, while

Eldredge was firm in his adherence to his original decision, they were treated with "all due courtesy" and consideration, and there is no evidence to the contrary. Nor is there any evidence to show or indicate that during any of these conferences Eldredge manifested any anger or irritation, used any violent or intemperate language to or with reference to Hudgins, or, in submitting to the committee the charges here complained of, indulged in any abusive remarks about Hudgins or made any other charges against him.

The first conference was held at the request of this committee. What took place in that conference is thus summarized by Captain Downing, a witness for the plaintiff:

"At that conference we went into the matter very carefully with him, asking the reasons why Captain Hudgins was discharged, and the reason given was that he had left the 'turnstile' purser on the dock at Pine Beach and that in doing so had caused a big number of people to be left at Newport News which had created quite a stir and a protest. * * * Those people had been to a football game, as I recall he stated, and he felt it was his duty to take disciplinary action and had discharged Captain Hudgins for that reason. We asked if there were any other reasons. He said no; and we told him, according to Marine custom and according to our judgment, that the action taken was too severe; that we did believe that suspension for sixty or ninety days would be just as effective, create good discipline on his boats, and would be more just to Captain Hudgins. We did not feel or believe that the charges against him justified dismissal, especially since he had been in the service some time. He insisted, however, that there was no other course open and he could not reconsider his action." * * * "He seemed very determined."

Captain Hodges, a witness for the defendants, testified on

cross-examination with reference to the first conference, in part, as follows:

"Q. At that conference what was Mr. Eldredge's attitude towards yourself and Captain Hudgins?

"A. His attitude was always good. He was on one side of the argument and we on the other. We never could agree, but we were treated very nicely.

"Q. Did he say anything derogatory of Captain Hudgins at this first conference?

"A. The only complaint at that time was the fact that he left what they called the turnstile purser on dock at Pine Beach."

At this conference the written statement of Hudgins, dated November 8th, and a statement signed by three deck hands, dated November 12th, with reference to the circumstances under which the purser was left in Norfolk were presented to Eldredge by the committee. In his statement Hudgins says: "There were no cars on the dock and none in sight, and I naturally thought both pursers were on board. Saw Mr. White and called down to the head deck hand to know if both pursers were on board and he said they were. I then rang the boat ahead and proceeded on the trip to Newport News."

The statement of the deck hands reads in part as follows: "Captain J. L. Hudgins called to me and asked if both pursers were aboard before leaving the dock and I told him they both were on board. Of course I thought they were." This is signed by "Theodore Royster, deck hand;" and also by two others.

So far as the record shows Eldredge made no comment at the time, or during any of these conferences, with reference to these statements. However, on cross-examination on the trial of this case Eldredge admits that if the facts were as stated in those two statements Hudgins should not have been dismissed; but testifies further with reference to these statements as follows:

"Q. Isn't this in accord with what Captain Hudgins told you?

"A. No.

"Q. Do you mean to say that man when he was trying to justify himself with this didn't tell you the same thing that he had made every inquiry to find out if the pursers were aboard?

"A. He told me some one said, 'all right,' and he went off. He didn't tell me that any one had told him the pursers were aboard. He said he thought the pursers were aboard.

"Q. Very well, assume that to be true, that he had called down and asked if everything was all right and he was told by one of the deck men that everything was all right and he was mistaken and the man was not on the boat, do you think he ought to have been discharged?

"A. I don't think he called down.

"Q. Suppose you answer my question?

"A. 'All right' doesn't mean anything.

"Q. Answer my question.

"A. Under the circumstances, yes.

"Q. You say you don't believe he did call down, do you?

"A. I do not think that those men told him that the pursers were on board as stated in that written statement.

"Q. Then you think that Captain Hudgins and all of those three men are telling an untruth about it; is that the idea?

"A. I certainly do. I think it was framed up."

The fact that Eldredge testifies that he believed these statements to be a frame up is one of the points on which the defendants in error most strongly rely as proving that Eldredge was actuated by malice.

The committee then requested a conference with Mr. Rodgers, the president of the company, which was granted.

At this, the second, conference Rodgers, Eldredge and

Herman were present on the part of the company and Downing and Hodges in behalf of Hudgins.

Captain Downing testifies with reference to this conference as follows:

"The matter was gone over very carefully with Mr. Rodgers, each detail, and each paper that had been considered so far was placed before him, arguments presented, and at that point Mr. Rodgers suggested that Captain Hudgins might be reinstated; that there might be some way of reinstating him; and then Mr. Eldredge and Mr. Herman requested a conference with Mr. Rodgers in the next room." * * * "My recollection is that Herman suggested the conference first." * * * "At all of these conferences we had insisted to Mr. Eldredge that if the reason given us was the only reason, that we could not accept or consider his act as fair or justified. After they came out Mr. Eldredge made the statement that he requested a further conference, at which time he would present written or documentary evidence to further justify his position."

Captain Hodges, on direct examination, testifies as follows with reference to this second conference:

"We took up the same question with Mr. Rodgers, telling him what had been done, and the situation was discussed. After some discussion, Mr. Rodgers, as I remember, asked Mr. Eldredge to come over to his private office. They went out and had a talk and came back. Mr. Rodgers informed us that Mr. Eldredge seemed to be pretty well fortified in his stand that he had taken. He believed, though, that Mr. Eldredge would be willing probably to allow Captain Hudgins to * * * put his application on file for reinstatement at the first opening. Mr. Eldredge, my recollection is, seemed inclined to do that." * * "I said to Mr. Eldredge that this * * would mean that he would not ever be re-employed, that it would remain

on file; and if you are going to retain your present stand, I believe, and can't help believe, that there must be something else back of the situation besides the fact that Captain Hudgins left the 'turnstile' purser on the dock; and if there is, we want to know it."

"Q.   Then what happened, Captain?

"A.   It was then that he somewhat reluctantly agreed that there were other things, and suggested that we come back to his office the following Tuesday.

"Q.   You say he agreed reluctantly?

"A.   Well, I should say so; yes, sir.

"Q.   Did he volunteer any reasons?

"A.   There were no reasons given at that time.

"Q.   Well, what was his attitude at that time respecting yourself and Captain Hudgins?

"A.   We were always treated very nicely.

"Q.   Did he use any statements at that time derogatory to Captain Hudgins' character?

"A.   No, sir; none that I can think of.   No, sir."

Eldredge testifies that at the first conference the committee asked him "if there wasn't something else," to which he replied "that the charges on which I dismissed him were sufficient."   With reference to the second conference he testifies as follows:

They "were quite insistent that I furnish something else; that there must be something else against Captain Hudgins. Finally I told them that there was something else; that there had been reports made to me, and that if they would call at my office on the following Tuesday I would place those reports before them in writing."   *   *   "I was referring to reports that had been made to me by our investigator, Mr. Herman."

Eldredge further testifies that these reports had been made to him orally; that they had been reported to him by Herman from time to time in the usual line of business;

that prior to that time he had not investigated the reports, but after he received them he had seen to it that a captain was always aboard the ship upon which Hudgins was acting as mate; that after the second conference he asked Herman if he could have these reports confirmed; that in response to that request Herman brought to him written statements from those who had made the said charges against Hudgins which Herman had theretofore reported to him orally; and that these statements are the statements laid by him before Captain Downing and Captain Hodges at the third conference.

The third conference is the only occasion on which a communication by Eldredge of the charges sued upon is proven. If they can be said to have been reiterated at the fourth conference, it is only from an uncertain and doubtful inference. The only persons present at that conference were Eldredge, Downing and Hodges. Eldredge, without making any comment thereon or any other remarks derogatory of Hudgins, presented three written statements to Captain Downing and Captain Hodges and permitted them to read them. All three are in the forms of letters addressed to "Mr. D. C. Eldredge, General Manager, Chesapeake Ferry Company, Norfolk, Va." One is dated November 21, 1927, and the other two November 22, 1927. Omitting the dates and addresses, they read as follows: "Dear Sir:

"It is my personal knowledge that on frequent occasions Captain J. L. Hudgins used whiskey while on board the steamers of the Chesapeake Ferry Company, while on watch with myself.

"On one specific occasion Captain Hudgins was inebriated and incapacitated to perform his duties as mate. The captain in this instance had to substitute for him.

"Yours very truly,
"R. N. HEDGEPETH,
"Purser-Automobile."

"DEAR SIR:

"On one particular Sunday night, about twenty or thirty minutes after the steamer of the Chesapeake Ferry Company had tied up for the night, Captain J. L. Hudgins had a woman in his stateroom, resulting in the concession clerk, occupying the adjoining room, becoming greatly embarrassed and in her hurriedly leaving the steamer.

"This was reported to me the next morning.

"Yours very truly,
"H. S. HERMAN,
"G. S. HERMAN,
"In charge of concession stands.
"Above statement correct.
"FANNYE RIGSBY,
"Concession clerk at the time."

"DEAR SIR:

"It is my positive knowledge that Captain C. L. Hudgins has had whiskey on board the steamer on which we both were on watch, and was seen on frequent occasions to drink some while on duty. This statement is further corroborated by the fact that he, Captain Hudgins, did on one occasion leave a bottle in the concession stand on board the steamer for safe-keeping.

"Very truly yours,
"VIOLET GENUNG,
"MISS VIOLET GENUNG,
"Clerk in concession stand."

. The statements in these letters are the words which are declared upon in the declaration.

Captain Hodges testifies that the letters were handed to them and they were allowed to read them; that Eldredge did not tell them "just where he had gotten them;" and that in the conversation at this time Eldredge said "he had tried to close this matter on the first charge of leaving the turnstile purser on the dock, because he felt that he

did not want to say or do anything that would probably be hurtful to Captain Hudgins in the future."

With reference to the letters and charges therein made, Eldredge testifies as follows:

"Q. Mr. Eldredge, did you have anything to do with dictating the contents of those letters?

"A. No, sir.

"Q. Did you know what was going to be in them or what was in them until they were presented to you?

"A. I knew about what would be in them.

"Q. How did you know that?

"A. On account of the reports that had been made to me previously by word of mouth.

"Q. Did you know just when these things were supposed to have happened?

"A. No, sir.

"Q. Did you or did you not believe them to be true when they were presented to you?

"A. I certainly did believe them to be true.

"Q. What reliance, if any, did you place in Mr. Herman?

"A. I had always found Mr. Herman reliable and truthful.

"Q. Did you know that those statements were false?

"A. I did not.

"Q. What did you do with those statements?

"A. I presented them to Captain Hodges and Downing, of the Masters, Mates and Pilots Association, as I told them I would.

"Q. Did you make any comment on them?

"A. I made no comment."

Succeeding the presentation of these letters to the committee a fourth conference was held in the office of Mr. Eldredge. This conference was held at the instigation of Hudgins himself.

At this conference (the fourth) Eldredge, Hudgins, Captain Downing and Captain Hodges were present. White,

the purser who was discharged at the time Hudgins was discharged, was also present, but took no part in the conference. While the evidence is somewhat vague on this point, the only fair inference from the evidence is that. Hudgins, and not Eldredge, was responsible for his presence there.

The purpose for which the conference was sought was to inquire into the truth of the charges made against Hudgins in the letters above mentioned, and the first part of the conference proceeded as an investigation conducted largely by Captain Downing, in which Hedgepeth, H. S. Herman and Captain Morrissette were interrogated, all of whom appear to have been present at the instance of Hudgins.

The testimony of Hudgins, Captain Downing and Captain Hodges with reference to the matters brought out in this investigation is well summarized in the following statements taken from the testimony of Captain Downing:

"We had statements from Captain Hudgins, of course, but we went in conference and naturally we investigated the charges as presented. Mr. Hedgepeth's charge of Captain Hudgins coming on the boat intoxicated so he couldn't take duty was first investigated. The question was asked why he knew that Captain Hudgins was drunk. I said: 'It is stated over your signature, of your own certain knowledge, that he was drunk,' * * he seemed to be very much ill at ease, and said, 'well, that is common talk around the boat.' I said: 'Is that the only evidence you have that he was drunk?' 'Well, yes.' Other questions were asked him—another question was asked him, how did he know that Captain Hudgins had been drunk on several occasions or drank on the boat, and that question was never answered. He seemed to be very ill at ease when other questions came up and that question wasn't answered."

"Captain Morrissette was then asked * *. He said that Captain Hudgins came on board and complained to

him that he was not feeling well, was sick, and he went on duty and remained on duty, I think, for about two hours and felt worse so he told him to go to his room and lay down and take a little nap, and probably he would feel better, and that he did and, so far as he knew or believed, Captain Hudgins was not drunk or he had never seen him drink on the boat. That was the result of the investigation of that particular charge."

The charge that he had a woman in his room "was next considered * * and Captain Hudgins presented a paper signed by the same lady who is supposed to have made the complaint, denying absolutely any knowledge of such a thing ever occurring and there was nothing further to go on that because there was no one to examine. She was supposed to have made the statement and over her own signature she denied any knowledge of any occurrence of this kind."

"These two offenses had been about three years prior to Captain Hudgins' discharge. Then the question of drinking on the boat and having liquor in the ice box, as I recall— Mr. Herman presented that charge and insisted that Captain Hudgins had drank on the boat and he drank with him at different times and Captain Hudgins denied it. Captain Morrissette said he never saw him drunk on the boat and never knew he had drunk on the boat and Mr. Herman said he had seen him drink on the boat and had drunk with him."

The paper referred to in the above testimony is a statement signed "Fannye Rigsby" which states: "I never told Mr. Herman, nor any one else, that Captain Lee Hudgins had a lady in his room on the boat which I worked two years ago."

Miss Genung was not present and no other statement from her was introduced.

All then withdrew except Eldredge, Downing and Hodges.

As to what then took place Captain Downing testifies as follows:

"The witnesses, those who had testified, left the room and we talked it over with Mr. Eldredge; told him that we felt his charges were absolutely disproven, or, in other words, he had failed to prove his charges, and told him we felt the position he had taken was not justified, and we then were going to ask him to reconsider and reinstate Captain Hudgins. He then said that he would accept his application for consideration and reinstatement when he had a position.

The testimony of Eldredge on this point is:

"Hodges and Downing remained. They said they thought that I might fix it up and do something for Hudgins; that those statements didn't seem very strong to them. I admitted it.

"Q. You admitted that they didn't seem strong to you?

"A. I did, and we talked the matter over and finally I suggested to them that I allow Hudgins to place an application on file with us in the regular way and that I would employ him—I didn't say that. I didn't say I would employ him. I said I would offer him employment should anything turn up, should a vacancy occur, and I think I said the first vacancy. They didn't agree to that. They seemed to be pleased that I made that suggestion, but there was no agreement along those lines."

Upon direct examination Captain Hodges testified as follows as to Eldredge's attitude at this fourth conference:

"Q. What was Mr. Eldredge's attitude toward Captain Hudgins in this fourth conference in which Captain Hudgins was present?

"A. I never saw any signs of anything but what you would expect of a gentleman when you went in his office toward Hudgins or anybody else.

"Q. Did he show any grudge against him?

"A. No, not to my knowledge.

"Q. What did Mr. Eldredge do or say when Hedgepeth made his answers to the questions?

"A. I can't remember of him having done anything.

"Q. Did he show any emotion of any kind?

"A. No.

Hudgins himself, both at this conference and in his testimony in this case, denied all the charges against him contained in said letters.

Immediately after said fourth conference, the following letter, dated December 5, 1927, addressed to Mr. D. C. Eldredge, General Manager, Chesapeake Ferry Company," was delivered to Eldredge:

"DEAR SIR:

"After our several conferences and a very careful study of Captain J. L. Hudgins' case, our convictions are as follows:

"1st. That disciplinary action, to avoid a recurrence of the very disagreeable and awkward situation, resulting as it did from Captain Hudgins' leaving the turnstile purser on the dock, should have been taken, but in all fairness, we do not believe, in the light of the facts established, that this act justified his dismissal. Investigation of other statements which were offered as further grounds for his dismissal were not fully established, which we believe you realize as fully as we do.

"We have no reason to doubt your intention to be perfectly fair in this case, and with these facts before us, we feel justified in requesting that you reinstate Captain Hudgins on, or before, January 1, 1928. This would be a suspension of more than two months, which, according to marine custom, would be quite severe punishment for the offense, and we believe it would instill discipline as much as if he were discharged. It would further show your employees your disposition to deal with them, and we believe

improve the efficiency of your service, for the men would feel secure in their positions when they had done their duty well.

"If you find you cannot do this, in justice to Bro. Hudgins, we.shall feel it our duty to ask you to join us in another conference with Mr. Rodgers.

"Thanking you in advance for an early reply, beg to remain,

"Yours very truly,

"GEO. B. DOWNING, Secretary.

"J. IRA HODGES, President."

A few days after the letter of December 5th was written Eldredge asked Captain Hodges to come to his office in Norfolk, which he did. As to what took place at that time Captain Hodges, on direct examination, says:

"He told me that so far as he was concerned, he had decided to close the matter and, so far as Captain Hudgins was concerned, he had done some little investigating himself and felt pretty sure that he had taken the right stand and he wished to withdraw the offer of reinstating him; that the two of them would not work together again in the ferries as long as he was general manager."

On cross-examination Captain Hodges testifies further with reference to this:

"Q. He told you that he revoked what he said about Hudgins putting in his application?

"A. Took back everything.

"Q. And said that he had done some private investigating of his own, didn't he?

"A. Yes, sir.

"Q. Did he say that the stand he had taken at the various meetings had been justified by this investigation?

"A. No, sir; I have no recollection of anything like that being said. His final decision was evident that he still believed that he had been correct all the way along.

"Q.  He said that he was convinced, did he not, that his stand was proper and correct?

"A.  Yes.

"Q.  That he was going to stand by his position?

"A.  Yes."

Eldredge testifies on direct examination with reference to this interview with Captain Hodges:

"Some few days after" (the fourth conference) "it was reported to me through regular channels that Captain Hudgins was circulating among the boats and I made certain deductions.  *  *  *  It was my feeling that Captain Hudgins was circulating about the boats in order to foment a strike; that the masters, mates and pilots had simply been dogging me and dogging me and trying to get it out of my hands and get a decision over my head.  They had no reason to think that, if they had known the position I held and what authority I had.  I then called in Captain Hodges, after I told about Hudgins circulating on the boats, buzzing around there, and there seemed to be an undercurrent of feeling around the boats there that somebody was trying to start a strike—the Masters, Mates and Pilots Association were, and Hudgins was down there soliciting support.  I called in Hodges and I told him from what I had learned I thought I had been right the first time in dismissing Captain Hudgins and that I would withdraw my suggestion as to his reinstatement and that the matter would stand as before.  *  *  In confirmation of that I addressed a letter to the Masters, Mates and Pilots Association, to Captain Hodges and Captain Downing."

Upon cross-examination Eldredge testifies that the reports about Hudgins "circulating around the boats" came to him from Herman, the company's special investigator; that there was "nothing really specific except that he was circulating around the boats and there was a rumor that there was going to be a strike and Captain Hudgins was

looking for support;" that he (Eldredge) put two and two together and thought Captain Hudgins was guilty of fomenting them; and that he did not tell Captain Hodges anything about Hudgins circulating around the boats fomenting a strike.

When recalled, Captain Hodges says that this interview was very short; that nothing at all was discussed; and that Eldredge made no complaint about Hudgins fomenting trouble.

Hudgins, when recalled, denied having attempted to foment a strike or any other trouble among the employees of the company.

Following his interview with Captain Hodges, Eldredge wrote to Captain Hodges and Captain Downing a letter, dated December 12, 1927, which reads as follows:

"GENTLEMEN:

"Yours of December 5th.

"The several conferences to which you refer has only tended to confirm the management's opinion that action taken by us in the case of Captain J. L. Hudgins was the only proper one.

"In recent conversation with Mr. J. Ira Hodges, we informed him that Captain Hudgins would not again be accepted for employment by his company, at which time the opportunity was taken to withdraw the suggestion of offering Captain Hudgins employment, should an opening exist.

"With regard to the last paragraph of your letter, please be advised that the sole responsibility for handling the personnel of the Chesapeake Ferry Company is vested in this office; therefore, such being the case, we can see no advantage in carrying this matter further.

"Yours very truly,

"D. C. ELDREDGE,

"General manager.

"Copy to
"MR. JOHN H. RODGERS, President,
"Norfolk, Virginia.
"E/t."

Throughout his testimony Eldredge repeatedly states that he acted throughout this whole affair without ill will or bad feeling towards Hudgins and had no desire to do him injury; and that in what he did he was acting in good faith for what he deemed to be the best interest of the Chesapeake Ferry Company.

There is no evidence that Eldredge, or any other officer or employee of the Chesapeake Ferry Company, communicated the charges here complained of to any person other than those above mentioned under the circumstances above mentioned. But Captain Downing and Captain Hodges appear to have reported what took place at these conferences to the association by which, at the request of Hudgins, they had been appointed to investigate the matter of Hudgins' discharge. To what extent Hudgins, Downing and Hodges and the members of said association have given publicity to these charges does not appear. Hudgins testifies that since his discharge he has been unable to get employment; but it nowhere affirmatively appears that the people to whom he applied knew of these charges or that his inability to get employment has been due thereto.

The court gave at the request of the plaintiff three instructions to which the defendants excepted, the giving of each of which is assigned as error, but we need here examine only one of them, instruction No. 6, which reads as follows:

"The court instructs the jury that every person must be supposed to intend the natural and probable consequences of his acts and it is not necessary to render the act complained of malicious that the defendant, Eldredge, should have been actuated by a feeling of hatred or ill will toward

the plaintiff or that he entertained or pursued any bad purpose or design. But if, in speaking the words complained of, the jury believe that said defendant, Eldredge, wilfully inflicted an injury on the plaintiff which was not warranted by the law, the speaking of such words was malicious in law and in itself injurious."

This instruction was objected to by the plaintiffs in error on the ground that "it wholly disregards the fact that the occasion at which the words were spoken or written was privileged and does not instruct the jury that such findings as they may make under that instruction must be supported by the evidence. The instruction leaves the jury free to find a verdict regardless of the evidence."

The objection was well made. The court erred in giving this instruction.

■ The court, in this instruction, applies to this case the law applicable to cases in which the occasion upon which the words were spoken was neither absolutely nor qualifiedly privileged, and to cases in which the extent of the publication or the words spoken have gone beyond the extent of the privilege when the occasion was privileged. In such cases it is not necessary to prove malice, or as the courts say, the law *imputes* malice to the defendant *merely* from the fact that the words spoken were intentionally and wrongfully spoken to the injury of the plaintiff without legal justification or excuse, regardless of whether or not the words were spoken with any actually existing malice. This is in effect what instruction No. 6 tells the jury is the law of this case.

■■ Malice so imputed is often designated as *malice in law* to distinguish it from actually existing malice, which is commonly designated as *actual* malice, *express* malice, or *malice in fact*. It is a creature of legal fiction invented to meet the legal fiction that has grown up that malice is an essential element of slander and libel, instead of simply

declaring that the unprivileged publication of defamatory matter, false in fact, is actionable whether spoken with or without malice, and in such cases the existence of malice is immaterial unless punitive damages be sought. *Coleman* v. *MacLennan,* 78 Kan. 711, at page 740, 98 Pac. 281, 291, 20 L. R. A. (N. S.) 361, 130 Amer. St. Rep. 390; *Prince* v. *Brooklyn Daily Eagle,* 16 Misc. Rep. 186, at page 187, 37 N. Y. S. 250, 251; *Davis* v. *Hearst,* 160 Cal. 143, 116 Pac. 530, 538.

In *Prince* v. *Brooklyn Daily Eagle, supra,* the court says: "The cause of the many misunderstandings thereon in these actions (and the reports and text-books are filled with them) arises from the doctrine that two different kinds of malice appertain to such actions. Indictments for libel had to charge that the publication was malicious, for malice was an essential of the crime, and had to be proved. Civil pleaders, fond as they were of verbiage, specially attributing bad and wicked motives in actions of tort, needlessly came to plead in the same form, and from the fact that the allegation of malice was always found in the declaration or complaint, it seems that malice gradually came to be deemed essential to the action. We find judges stating it to be essential (only casually at first) at an early period in England, and the same has continued in judicial utterances, though not so often actually decided, down to the present time, but not without able and discriminating judges and text-writers standing out against it all along. It being said that malice was essential to the action, it was at once found that a bothersome fiction was put in the way, whereupon the lawyers and judges straightway invented and set up another fiction against it, so as to destroy its force, viz., that the malice essential to maintain the action would be presumed in every case. And these two useless fictions, the one laughing at and offsetting the other, have been fostered, and have come down to us, causing controversy, misunderstanding and confusion all the way."

In *Coleman* v. *MacLennan, supra,* the court says:

"It is said that malice is the gist of the action for libel. This is pure fiction. It is not true. The plaintiff makes a complete case when he shows the publication of matter from which damage may be inferred. The actual fact may be that no malice exists or could be proved. Frequently libels are published with the best of motives, or perhaps mistakenly or inadvertently but with an utter absence of malice. The plaintiff recovers just the same. Therefore, 'the gist of the action' must be taken out of the case. This is done by another fiction. It is said that of course malice does not mean the one thing known to fact or experience to which the term may apply, but it is just a legal expression to denote want of legal excuse. In this State a statutory definition of libel making malice an essential ingredient as at the common law compels this court to say that the intentional publication of libelous matter implies malice, whatever the motive may be. * * So, a fiction was invented to meet an unnecessary fiction which became troublesome, and the courts go on gravely ascending the hill for the purpose of descending, meanwhile filling the books with scholastic disquisitions, verbal subtleties and refined distinctions about malice in law, malice in fact, express malice, implied malice, etc., etc."

However, as is said in *Davis* v. *Hearst, supra,* "No particular harm can be worked by the declaration that malice is a necessary part of every action for libel" (or slander), "if it be understood that the particular malice there referred to is the constructive or fictional malice which we have designated malice in law." But the courts should be careful not to inject the legal fiction of constructive malice into their instructions in cases where the existence of malice in fact must be proven.

██ In the instant case the occasion was qualifiedly privileged, the words spoken were within the scope of the

privilege which the occasion created; and the extent of the publication did not go beyond the extent of the privilege.

In such a case in order to avoid the privilege it is necessary for the plaintiff to show that the words were spoken with *malice in fact, actual malice,* existing at the time the words were spoken; that is, that the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff. *Chalkley* v. *A. C. L. R. Co.*, 150 Va. 301, 143 S. E. 631; *Strode* v. *Clement*, 90 Va. 553, 19 S. E. 177; *Aylor* v. *Gibbs*, 143 Va. 644, at page 648, 129 S. E. 696; *International & G. N. R. Co.* v. *Edmundson* (Tex. Com. App. 1920), 222 S. W. 181; *Finley* v. *Steele*, 159 Mo. 299, 60 S. W. 108, 52 L. R. A. 852; Newell on Slander and Libel (4 ed.) section 271, section 272, section 277; Sutherland on Damages (4 ed.), section 1205; Odgers on Libel and Slander (1 Amer. Ed.), 234–238.

Instruction No. 6 is an excerpt of one paragraph, with certain deletions and changes, from instruction No. 4 which was given in *Williams Printing Co.* v. *Saunders*, 113 Va. 156, at page 162, 73 S. E. 472, 478, Ann. Cas. 1913 E, 693, upon which case the defendant in error relies to support the giving of instruction No. 6. This case does not, however, sustain the giving of instruction No. 6 in a case such as this at bar. The facts of the two cases are entirely different. The case at bar involves a communication which is privileged unless the words were spoken with malice in fact existing at the time they were spoken, while the *Williams Printing Company Case* involved a publication which was not even conditionally privileged.

In *Williams Printing Company* v. *Saunders*, the defendants had published an article, or articles, making an attack

on the private character of Saunders, who was a candidate for office, and charging him with acts involving moral turpitude. The defense was that the publication was privileged; but the court in affirming the judgment of the lower court held, as a matter of law: "A publication of this character is not even conditionally privileged. From the publication of such libelous charges the law *implies malice*, as well as damages to the plaintiff; and the jury may, *therefore*, on proof of the publication *only*, render a verdict for substantial damages." (Italics ours.)

Later in its opinion the court clearly differentiates between the law applicable to cases in which there is no privilege and those in which the words written or spoken are conditionally privileged. After having said that "it is the right and duty of the citizen to criticise public officers and candidates for public office, and that proper criticism is privileged, and imposes no liability unless *express malice* be shown" (italics ours), the court says:

"While proper criticism of the conduct or fitness of public officers and candidates for public office is privileged, the privilege does not extend to the imputation of moral delinquency to such persons, and he who attacks their private character and attributes to them moral turpitude must stand prepared to prove the truth of his statements under a plea of justification; otherwise the presumption is that the defamatory language, written or spoken, is false, and will, without more, support a verdict for substantial damages."

■ Instruction No. 6 is open to other objections also. It does not confine the jury to belief from the evidence; and it leaves to the jury the question of whether the injury inflicted upon the defendant was warranted by the law, without giving in this, or other instructions, in such form as not to confuse the jury, the requisite information as to what the law is with reference to when an injury is warranted by the law, or applying the instruction to the facts

of the case at bar. These objections do not lie to instruction No. 4 given in the case of *Williams Printing Co.* v. *Saunders*, upon which defendant in error relies.

■ However, the defendant in error contends that any error which was committed by the giving of instruction No. 6 was cured by other instructions given. The other instructions given by the court bearing on this point are numbers 1 and 2, asked for by the plaintiff, and instructions D-2, D-3 and D-4 asked for by the defendants, which read as follows:

"1. The court instructs the jury that though the occasion is privileged, it must be used in good faith and without malice; strong and violent language or insinuations disproportional to the occasion may raise an inference of malice and thus lose the privilege that would otherwise attach to it, and the same is true if the jury believe from the evidence that the defendant, Eldredge, availed himself of the occasion not to protect his interests or those of the Chesapeake Ferry Company, but to gratify his ill will and insult the plaintiff. And whether such an inference of malice is to be drawn from the language used, the manner of its publication, or the circumstances under which it was used, is a question for the jury. The question of good faith, belief in the truth of the statements or insinuations, and the existence of actual malice under all the circumstances of the case remains with the jury.

"2. The court further instructs the jury that while malice is the gist of this action, and proof that the defendant, Eldredge, was actuated by malice in making said publication is necessary for a recovery, yet this does not necessarily mean hatred or ill will towards the plaintiff.

"D-2. The court instructs the jury that the occasion on which the language alleged to have been used by Mr. Eldredge being a privileged occasion, it is presumed that the statements then made were without malice.

"D-3.   The court instructs the jury that they must find for the defendants in this case unless the jury believe from the evidence that the defendants had actual or express malice against the plaintiff existing as a fact at the time the communications complained of were made and which inspired and colored the said communications; that is to say, the defendants must have imputed acts to the plaintiff which the defendants did not believe to be true, or that the communication was made for some sinister or corrupt motive, or from motives of personal spite, ill will, or with such gross indifference as to be wilful and wanton.

"D-4.   The court instructs the jury that even though they believe from the evidence that Mr. Eldredge made the statements respecting Captain Hudgins as alleged in the declaration, yet under the evidence in this case the occasion was privileged and the defendants are entitled to a verdict in their favor in this action unless the jury further believe from the evidence that the occasion which brought forth the statements was used not only for the purpose of communicating matter in which the principals were mutually interested, but for the purpose of gratifying ill will toward the plaintiff, or in wilful disregard of his rights, and the jury are further instructed that the burden is upon the plaintiff to show to the jury by sufficient evidence to convince reasonable minds that the defendants held actual malice toward plaintiff, and were prompted by such malice to make the statements of which complaint is made."

These instructions do not cure the error in instruction No. 6.   This instruction announces a positive rule of law which is not contained in the other instructions; is inconsistent with and contradictory of the law as stated in the instructions above quoted, especially instruction D-3; is not applicable to the case at bar; relates to the most vital point in the case, and was prejudicial to the plaintiffs in error.

■ "While omissions in one instruction or set of instructions may sometimes be supplied by a fuller statement in one or more other instructions, where it would not confuse or mislead the jury, it is rare, if ever, that positive error can be so corrected. A material error in an instruction, complete in itself, is not cured by a correct statement of the law in another instruction, as it is said that it cannot be told by which the jury were controlled. Hence in such case the verdict will be set aside, unless the court can see from the whole case that no other verdict could have been properly found." Burks, J., in *Reliance Life Ins. Co.* v. *Gulley*, 134 Va. 468, page 483, 114 S. E. 551, 556.

In the case at bar it cannot be said that no other verdict could have been properly found, and the court should have set aside the verdict for misdirection of the jury.

Having reached this conclusion, this brings us to a consideration of the evidence upon its merits regardless of the verdict of the jury. Section 6365, Virginia Code, 1919.

■ In considering the evidence it is to be borne in mind that there can be no recovery in this case for the discharge of Hudgins by Eldredge, acting for the Chesapeake Ferry Company. Whether in discharging Hudgins, Eldredge acted rightly or wrongly, with propriety or impropriety, upon sufficient or insufficient grounds, has no bearing whatever on this case, except in so far as it may tend to show that Eldredge entertained malice towards Hudgins at the time he communicated to Downing and Hodges the charges here complained of. It is by no means clear that the jury in reaching its verdict bore this in mind.

■ Public policy and the interest of society demand that in cases such as this an employer, or his proper representatives, be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer. There is a privilege on such occasions and a

communication made under such circumstances, within the scope of the privilege, without malice in fact, is not actionable, even though the imputation be false, or founded upon erroneous information. The question is not as to the truth or falsity of the communication, or whether the action taken by the defendant with reference thereto or based thereon was right or wrong, but whether the defendant in making the publication acted in good faith or was inspired by malice. *Strode* v. *Clement*, 90 Va. 553, 19 S. E. 177; *Brown* v. *N. & W. Ry. Co.*, 100 Va. 619, 42 S. E. 664, 60 L. R. A. 472.

In cases such as this, not only must malice be proven to exist at the time the words were spoken, but there is a presumption of law that the words were spoken in good faith, from proper motives, and without malice. This presumption has been raised as a matter of law upon the soundest grounds of public policy, and it requires more than a *scintilla* of evidence to overcome it. "Evidence merely equivocal, that is, equally consistent with malice or *bona fides*, will do nothing towards rebutting the presumption." Newell on Slander and Libel (4 ed.), page 317; Odgers on Libel and Slander (1 Amer. ed.), page 238; *Kenney* v. *Gurley*, 208 Ala. 623, 95 So. 34, 26 A. L. R. 813. Evidence which does no more than raise a suspicion that the defendant *might* have been actuated by malice or only a doubt as to the good faith of the defendant is, as a matter of law, not sufficient to rebut the presumption of lack of malice or establish the existence of malice. The evidence must affirmatively prove malice.

The contention of the defendant in error that the evidence shows affirmatively that Eldredge did not, at the time he laid the letters here in question before Captain Downing and Captain Hodges, believe in the truth of the statements contained in the letters, is only an inference with but little to support it and that of an equivocal nature.

On the other hand, there is strong and convincing evidence to show that he had reasonable and probable cause for crediting the truth thereof at the time he laid the charges before Captain Downing and Captain Hudgins, and did believe them to be substantially true.

"The fact that the statement is admitted or proved to be untrue is no evidence that it was made maliciously, though proof that defendant knew it was untrue when he made it would be evidence of malice." Newell on Slander and Libel (4 ed.), page 318; *Kenney* v. *Gurley, supra.*

The defendant in error contends that Eldredge repeated in his last conversation with Captain Hodges and in his letter of December 12, 1927, the charges contained in the statements laid before Captain Downing and Captain Hodges; and that this is not only sufficient to warrant, but requires, the inference that Eldredge was actuated by malice at the time he laid these statements before Captain Downing and Captain Hodges.

Neither in the said conversation with Captain Hodges nor in said letter of December 12th were the charges contained in said statements in terms or substance repeated, nor is it by any means a necessary inference from the language used that Eldredge reiterates a belief therein. Both this conversation and this letter were in response to the letter of December 5th addressed to Eldredge by Captain Downing and Captain Hodges in which they treat these charges as having been accepted by Eldredge as not established, and recur to the original charge of dereliction in duty in leaving the purser on the dock; and the conversation and letter of December 12th are not inconsistent with a mere reiteration of the opinion that his action in discharging Hudgins on this account was correct. These facts render any inference with reference to malice equivocal, and largely destroy the probative value of this conversation and letter as evidence tending affirmatively to

prove that when said statements were laid before Captain Downing and Captain Hodges, Eldredge was actuated by malice.

But there are other facts which further weaken the probative value of this conversation with Captain Hodges and said letter of December 12th for the purpose of showing the existence of malice at the time the charges complained of were originally made.

■■ The proof must show malice existing at the time the charges were made. When an action is brought on the original publication only, the repetition of the language sued upon or other words spoken or acts done after the time of the publication sued upon, is of probative value to show malice existing at the time of the original publication only in so far as the words spoken or acts done may be indicative of the continuation and persistence of a malicious attitude of mind having its origin prior to or at the time of the original publication. When the evidence shows, as it does here, an irritation arising subsequent to the original publication, based upon real or supposed grievances arising since the original publication, which may reasonably be taken to be a motivating cause of such later words or acts, and the undisputed facts tend strongly to show a change of attitude taking place after the original publication, words spoken or acts done after the original publication lose to a great extent their weight as evidence of malice existing at the time of the original publication.

Eldredge's own evidence and that of Captain Hodges, with reference to said conversation and said letter, warrant the inference that at the time of said conversation and at the time he wrote said letter he had become irritated by the insistence of Hudgins and those acting in his behalf, and their purpose to attempt to go over his head, as well as by what he believed, whether rightly or wrongly, to be indications of an attempt by Hudgins to foment trouble

among the employees of the ferry company. His testimony also warrants the inference that at the trial of this cause he was laboring under a feeling of irritation. But this irritation and the apparent causes thereof arose subsequent to the publication here sued on, and it is clear from the evidence that after the adjournment of the fourth conference, and apparently after the receipt of said letter of December 5th, his mental attitude towards Hudgins changed very materially from what it was when that conference ended and what it had theretofore been.

Upon an analysis of the evidence, we are of the opinion that the evidence relied upon by the defendant in error to support the inference that Eldredge was actuated by malice in laying before Captain Downing and Captain Hodges the charges here complained of, is not only insufficient to overcome the presumption that Eldredge in so doing acted in good faith and without malice; but that the weight of the evidence repels the view that Eldredge, in laying before said committee the charges complained of, was actuated by malice or acted with such gross indifference and reckless disregard of the rights of Hudgins as in law is equivalent to malice.

Our conclusion with reference to the lack of malice seems also to have been that reached by Captain Downing and Captain Hodges from their intimate knowledge of all that had occurred prior to December 5, 1927, for in their letter of that date to Eldredge they say: "We have no reason to doubt your intention to be perfectly fair in this case." It is further worthy of note that while these gentlemen who represented Hudgins in all these conferences say that he was firm in maintaining his original stand, neither of them testifies that at any time did Eldredge manifest any signs of anger, personal hostility, ill will or spite towards Hudgins, certainly not until after his receipt of the letter of December 5, 1927, in which it was intimated

that if he did not accede to their request to modify his action as to Hudgins, they would attempt to have him overruled by higher authority.

The judgment of the trial court will be reversed, the verdict of the jury set aside, and final judgment here entered for the plaintiffs in error, the defendants below.

*Reversed.*