# Richmond

CHESAPEAKE AND OHIO RAILWAY COMPANY v. RUDOLPH A.
HANES, ALSO KNOWN AS R. A. HANES, ADMINISTRATOR OF
THE ESTATE OF MALRIE VIRGINIA WRIGHT HANES,
DECEASED.

March 7, 1955.

Record No. 4322.

Present, Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Walter Leake* and *Meade T. Spicer, Jr.*, for the plaintiff in error.

*Hirschler & Fleischer* and *Rooke, Merhige & Cole*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

On December 1, 1952, at about 8:40 a. m., Malrie Virginia Wright Hanes, while driving her automobile southeastwardly along State Highway No. 652 and across the main track of the Chesapeake and Ohio Railway Company in Hanover county, Virginia, was instantly killed when her car was struck by the Diesel engine of an eastbound passenger train. In an action for wrongful death the administrator of her estate has recovered a verdict and judgment of $15,000 against the Railway Company which are before us for review. The only assignments of error we need consider challenge the sufficiency of the evidence to sustain the verdict and the rulings of the trial court on the instructions.

The collision occurred at what is referred to in the record as the "Church" or "Cool Springs" crossing just west of Atlee, a small station on the main line of the Railway Company between Charlottesville and Richmond. At this location the Railway Company maintains two parallel tracks, a main track

carrying both east and westbound trains and a spur track or siding to the north of the main track. While actually the tracks here run almost north and south, they are referred to throughout the record and briefs as running east and west and will be so designated by us. The main line track west of the crossing is continuously straight for some 2,000 feet, beyond which it curves to the north. In conformity with the same directional designation it may be said that State Highway No. 652, the dirt road along which the decedent was proceeding, runs approximately southeast, crossing the railroad tracks at an acute angle and connecting with State Highway No. 637 which runs approximately east and west along the southern side of the right of way of the Railway Company. Highway No. 652 approaches the railroad tracks from the north on a three per cent upgrade.

As an automobile proceeding southeastwardly along Highway No. 652 reaches a point 325 feet from the crossing the driver's view of the railroad to the west, the direction from which the train involved in this collision came, is obstructed by an embankment and bushes until the automobile reaches a point about 100 feet from the northern rail of the spur track. After the automobile has passed the embankment, for the next 50 feet the driver has a view across a field of the railroad tracks to the west. Proceeding further toward the crossing the driver's view to the west is obstructed by a two-story frame dwelling which is located north of the right of way of the Railway Company and in the acute angle formed by the intersection of the northern line of the right of way and the western line of the highway. This building obscures the driver's view of the tracks to the west until the front end of the automobile reaches a point six or eight feet from the northern rail of the spur track or 25 to 30 feet from the main track. After having passed this building the driver by turning his head to the right has a clear view of the main track to the west for more than a quarter of a mile. Just north of the spur track and to the west of the highway crossing is a conventional "crossbuck" sign.

The plaintiff's decedent was a woman forty years of age, in good health, and an experienced automobile driver. For six months prior to the accident she and her husband had lived on a farm about two miles west of the crossing. She was regularly employed in Richmond and drove her own automobile to and from work every day. In doing so she regularly used Highway No. 652, going over this crossing twice a day. Admittedly, she was thoroughly familiar with the crossing and its approaches. Her husband testified that when she left home that morning her car was "in perfect condition" and "running all right." The weather was clear and cold.

As the decedent's car was on or passing over the crossing it was struck by the Diesel engine of the eastbound train which was some twenty minutes behind its schedule and operating at a speed variously estimated at from 55 to 70 miles per hour. The automobile was carried by the locomotive more than 2,000 feet along the track, was completely demolished, and the driver killed instantly.

In the trial court the main contention of the administrator was that the Railway Company was negligent in that it failed to give by whistle and bell the crossing warnings required by Code, § 56-414 (as amended by Acts 1950, ch. 476, p. 944), and that its negligence in this respect was a proximate cause of the collision which warranted a recovery under section 56-416. The two sections are copied in the margin.[1] The ad-

---

[1] § 56-414. *"Bell and whistle or horn; when sounded.*—Every railroad company shall provide each locomotive engine passing upon its road with a bell of ordinary size and whistle or horn, and such whistle or horn shall be sharply sounded outside of incorporated cities and towns at least twice at a distance of not less than three hundred yards nor more than six hundred yards from the place where the railroad crosses upon the same level any highway or crossing, and such bell shall be rung or whistle or horn sounded continuously or alternately until the engine has reached such highway crossing, and shall give such signals in cities and towns as the legislative authorities thereof require."

§ 56-416. *"Effect of failure to give statutory signals.*—If the employees in charge of any railroad engine or train fail to give the signals required by law on approaching a grade crossing of a public highway, the fact that a traveler on such highway failed to exercise due care in approaching such

ministrator offered evidence which tended to show that the required statutory signals were not given. He contended that under the circumstances it was for the jury to say whether the failure to give the required signals was a proximate cause of the collision.

The Railway Company produced evidence which tended to show that the required signals were given. Moreover, it contended, even if such signals were not given, the decedent was guilty of negligence which was the sole proximate cause of the collision and barred a recovery.

Two witnesses testified that they were eyewitnesses to the collision, Walter H. Shaffer, who was standing near the crossing, and F. T. Roberts, the fireman on the Diesel engine.

Shaffer testified that on the morning of the accident he drove a truck from his home in Richmond to his father's house which is located on the northern side of the railroad tracks, in the vicinity of the crossing, to get a load of wood. He approached the crossing by driving westwardly along Highway No. 637 which, as has been said, runs parallel to and south of the railroad tracks. When he reached the intersection of this road and Highway No. 652 he turned right on the latter, intending to go across the crossing. He saw the Hanes car "sitting on the track," so he stopped his truck about 60 or 75 feet from the track, turned off the motor, "got out of the truck," and went toward the car, as he said, "to see what I could do, to see if I could help." As he approached the car he noticed that it was occupied by a woman. When he was "about 15 or 16 feet" away from the car he noticed for the first time that a train was approaching "a right good ways down the track," possibly 1,000 feet west of the crossing. He was asked, "Can you tell this jury whether or not a whistle

crossing shall not bar recovery for an injury to or death of such traveler, nor for an injury to or the destruction of property in his charge, where such injury, death, or destruction results from a collision on such crossing between such engine or train and such traveler or the property in his charge, respectively; but the failure of the traveler to exercise such care, may be considered in mitigation of damages."

or any signal was sounded?" His reply was, "I did not hear any." He estimated the speed of the oncoming train at "anywhere from 65 to 70 miles an hour." He made no attempt to signal the operator of the engine or warn the occupant of the car of the approaching train. As he said, "I went up there to help but didn't have time to do anything * * * but run back to the truck." After he had gotten "back to the truck" he saw the engine strike the car.

Although Shaffer said that he remained in the vicinity from five to ten minutes after the collision, or "maybe a little longer," he did not go down to the front of the train which had been brought to a stop east of the crossing, or make any inquiry as to who the occupant of the car was or what had happened to her. He proceeded across the railroad tracks and to his destination, his father's house.

On cross-examination Shaffer testified that in the truck with him were his five-year-old son and a friend, Raymond Milstead. At the time of the collision, he said, Milstead "was sleeping and drinking" and did not see the collision. Milstead, whose presence in the truck was known to counsel for the administrator but unknown to counsel for the Railway Company, was not called as a witness.

Roberts, the fireman on the locomotive, called as an adverse witness for the administrator, testified that he was seated in his customary position on the left side of the cab; that as the engine approached the crossing, and the crossing whistle was being sounded, he "clearly" saw the decedent's automobile approaching the crossing when it was "somewhere back of the frame house;" that the car "was moving up the road and it wasn't racing or anything like that;" that he called to the engineer, who was seated on the right-hand side of the cab, that the crossing was "clear;" that the car passed behind the frame dwelling and when he next saw it it had cleared that obstruction and was approaching the crossing at a speed of "not more than four or five miles an hour;" that it "kept coming and came a little bit closer to the crossing all the time, but I was looking for her to stop at any moment, running so slow;" that when the car "nosed" up on the track,

"I hollered to the engineer, 'We are going to hit her,' " and that he (Roberts) then observed that the occupant of the car was a woman and "was looking the other way," that is, in the oppositite direction from which the train was approaching her. Before the brakes on the locomotive could be applied it struck the car. Roberts estimated the speed of the train at the time of the collision to be 55 miles an hour.

The engineer, who was seated at the right front of the cab, did not see the car before the collision.

Other witnesses who did not actually see the collision testified that they observed the automobile approaching the crossing at a slow speed as the train approached.

Minnie Perkins, a witness for the administrator, testified that on the morning of the collision she was at the house of her brother, Arva Bell, which was about two miles from the crossing by road and "about a mile" therefrom "on a straight line;" that as she watched her sister-in-law doing her housework they listened for the crossing whistle and discussed whether it would be blown for the Cool Springs crossing. She was positive in her testimony that while the whistle blew at the next crossing to the west of the Cool Springs crossing "it did not blow" at the latter. Mrs. Bell was not called as a witness by either side. Other witnesses called by the administrator testified that they did not "hear" any crossing signals.

On the other hand, there was positive evidence on behalf of the Railway Company that the proper crossing signals were given. The engineer and firemen both so testified. Two passengers on the train, William O. Harris and his wife, who expected to get off a short distance east of the crossing and were paying particular attention to the crossing signals which were being given as the train approached their destination, were positive that the whistle signals were sounded for the Cool Springs crossing.

In this situation, we think that the evidence adduced on behalf of the administrator, if true, was sufficient to support a finding by the jury that the crossing signals were not given. According to Shaffer's testimony, he was within a few feet of

the crossing, saw the approaching train, saw the decedent's automobile in danger, and witnessed the actual collision. He was in a position to hear the signals and the conditions were such that he probably would have heard them had they been given. Under such circumstances his testimony that he "did not hear" the signals may not be disregarded as purely negative in character and devoid of probative value. *Virginian Railway Co.* v. *Haley*, 156 Va. 350, 373, 157 S. E. 776; *Southern Railway Co.* v. *Bryant's Adm'r.*, 95 Va. 212, 215, 216, 28 S. E. 183.

A vigorous attack was made on the credibility of Shaffer's testimony. It is argued that his story that he saw the decedent in the car which was stopped on the track and yet made no attempt to warn her of the approaching train, or to signal the engineer of her impending danger, and that after the collision he was not sufficiently interested to find out whether the occupant of the car had been killed or injured, is so contrary to human experience as to show it to be unworthy of belief. It was also developed before the jury that none of the disinterested witnesses in the neighborhood, some of whom observed the automobile approaching the crossing, and none of the train crew saw Shaffer at the crossing either before or after the collision.

There was evidence that Shaffer had been convicted of making a false statement, knowing it to be false, in support of a claim for unemployment benefits. Code, § 60-112. Since such an offense, although a misdemeanor, involved moral turpitude, evidence of the conviction was admissible as bearing on his credibility. *Bell* v. *Commonwealth*, 167 Va. 526, 189 S. E. 441; *Burford* v. *Commonwealth*, 179 Va. 752, 20 S. E. (2d) 509; *Taylor* v. *Commonwealth*, 180 Va. 413, 23 S. E. (2d) 139. But despite such attack the weight and credibility of Shaffer's testimony were for the jury.[2]

---

[2] After the verdict other facts were developed which cast further doubt upon the credibility of Shaffer's testimony. But since these subsequently developed facts were not brought to the jury's attention they need not be related.

Shaffer's testimony that the statutory signals were not given is corroborated by that of Mrs. Perkins, which has been related, although it is true that because of her distance from the crossing her opportunity to hear was not so good as that of Shaffer.

In our opinion the evidence plainly shows that the plaintiff's decedent was guilty of negligence as a matter of law which either proximately contributed to or was the sole proximate cause of the collision. It is undisputed that her hearing and sight were good and that she was thoroughly familiar with the crossing and its approaches. She knew of the obstructed view to her right or to the west as she approached the tracks. She also knew that after she passed beyond the frame dwelling on her right and for the next 25 to 30 feet before she reached the main track she had an unobstructed view to the west for about one-fourth to one-half a mile. She "should have looked and listened where it would have been effective and this duty was commensurate with the character of the crossing" as she knew it to be. *Butler* v. *Darden*, 189 Va. 459, 466, 53 S. E. (2d) 146, 149. The inescapable conclusion is that she was not keeping an effective lookout for the train.

At the slow speed at which she was driving she could have stopped the car, which as the evidence shows was in good condition, within a few feet. And yet, according to the testimony of Roberts, the fireman, she drove onto the track in front of the speeding train and was looking in the opposite direction just before the impact. According to the witnesses, L. H. Verlander and Lynwood E. Young, who saw her approaching the crossing but did not see the actual collision, she drove onto the crossing at such a slow speed and when the train was so close upon her that these two men speculated and remarked upon whether the driver of the car "was going to get caught on the track."

According to Shaffer, she remained in the car which was stopped on the track while the train in plain view sped toward

the crossing. Cf. *Seaboard Air Line R. Co.* v. *Crowder*, 191 Va. 635, 62 S. E. (2d) 227.

However, under the provisions of Code, § 56-416 (footnote 1), the contributory negligence of a traveler in approaching a railroad crossing does not bar recovery for an injury to or death of such traveler where there is evidence from which it may be fairly inferred that the failure to give the required crossing signals proximately contributed in any degree or in any way to causing such injury or death. Such contributory negligence of the traveler "may and must be considered in mitigation of damages." *Virginian Railway Co.* v. *Haley*, *supra* (156 Va., at page 377). See also, *Virginian Railway Co.* v. *Craighead*, 193 Va. 300, 305, 68 S. E. (2d) 647, 651.

On the other hand, if the crossing signals are given, section 56-416 does not apply and under common-law principles the contributory negligence of a traveler bars recovery. *Virginian Railway Co.* v. *Bacon*, 156 Va., 337, 348, 157 S. E. 789; *Norfolk & Western Ry. Co.* v. *Epling*, 189 Va. 551, 557, 53 S. E. (2d) 817, 820.

We are of opinion that it was for the jury to say whether the negligence of the decedent was the sole proximate cause of the collision, or whether the failure to give the required signals, if established by a preponderance of the evidence, proximately contributed to causing the collision. As was said in *Danville & Western Ry. Co.* v. *Chattin*, 192 Va. 216, 219, 220, 64 S. E. (2d) 748, 750, "The accident here was of such nature as the statutory signals were designed to prevent, and if the evidence tends to establish facts and circumstances from which it may be fairly inferred that there is a reasonable probability that the accident would not have happened if the signals had been given, then the question of causal connection is one of fact to be determined by the jury."

Viewing the evidence most favorably for the plaintiff administrator, if the accident happened as Roberts, the fireman, said, in that after the decedent cleared the obstruction she drove slowly toward the track, then it may be fairly inferred that had the whistle been sharply sounded at least twice at a

distance of not less than 300 yards nor more than 600 yards from the crossing, and the bell rung or the whistle sounded continuously or alternately until the engine had reached the crossing, as the statute requires, there is a reasonable probability that the decedent would have noticed the approaching train and brought her car to a stop before going onto the track, and thus avoided the collision.

In several instructions the lower court, over the objection of counsel for the Railway Company, submitted to the jury as an issue to be decided by them whether the decedent was guilty of contributory negligence. This was error, because, as we have said, such contributory negligence plainly appears from the record and there was no issue in this regard for the jury to determine. *Virginian Railway Co.* v. *Bacon, supra* (156 Va., at page 342). As counsel for the Railway Company now contends, and pointed out in the lower court, the only issues for the jury were whether the negligence of the decedent which was conclusively proven was the sole proximate cause of the collision, or whether the Railway Company failed to give the required crossing signals, and if so, whether such failure proximately contributed to cause the collision in any degree. If, as has been said, the signals were given, the decedent's contributory negligence barred a recovery by the administrator, and the jury were so instructed. But no issue should have been submitted to them as to whether the decedent was guilty of contributory negligence, for that was established as a matter of law. The failure of the trial court to instruct the jury properly on these pertinent issues was reversible error.

The view we have taken of the matter makes it unnecessary that we consider the assignment of error that a new trial should have been awarded on the ground of after-discovered evidence.

For these reasons the judgment is reversed, the verdict set aside, and the case remanded for a new trial in accordance with the views here expressed.

*Reversed and remanded.*