## GREAT COASTAL EXPRESS, INC.

### V.

## ROBERT WOODROW ELLINGTON

Record No. 822256

September 6, 1985

Present: All the Justices

*James M. Minor, Jr. (Ronald E. Kuykendall; Minor & Lemons, P.C.*, on briefs), for appellant.
*Joseph C. Russell* for appellee.

RUSSELL, J., delivered the opinion of the Court.

This is an appeal from a judgment awarding both compensatory and punitive damages for defamatory words to a plaintiff who was neither a public official nor a public figure against a defendant which was unconnected with the news media. The substance of the alleged defamation involved no matters of public concern. We must consider under what circumstances, in such cases, damages may be presumed, privilege may be a defense, and such a privilege may be lost.

Robert Woodrow Ellington was employed as a truck driver by Great Coastal Express, Inc., a trucking concern with offices in Richmond. Ellington made an average of ten trips per month for Great Coastal and was paid an average of $200 per trip. Prior to

the occasion complained of he was an employee in good standing, but there was evidence from which the jury could infer that he was suspected by Great Coastal's management of seeking to persuade his fellow drivers to join a union.

Great Coastal had scheduled a regular meeting of its road drivers to be held in Richmond on Saturday, September 5, 1981. Earlier that week, Ellington and several of his fellow drivers met at a restaurant in Annapolis, Maryland, and had a general discussion of various matters of concern to the drivers, including the advantages of a union and other subjects to be raised at the September 5 meeting. Great Coastal employed a private detective who was present in the Annapolis restaurant. He managed to overhear some of the drivers' discussion and reported its substance to the management of Great Coastal.

Great Coastal's trucks were equipped with "governors" which limited maximum speed. These were a source of frequent complaint by the drivers, who wished to increase the available speed. Great Coastal's regulations prohibited any alteration of company equipment, and copies of these rules had been given to all its drivers, including Ellington.

On Friday, September 4, after returning from a trip, Ellington asked Joseph Kovacs, Great Coastal's shop foreman, to increase the "r.p.m.'s" on his truck. He told Kovacs that the "r.p.m.'s" were set too low, that they could be increased without any effect on fuel consumption, and that he would tell no one if Kovacs made the change. Kovacs refused, saying that he was bound by the company's specifications. This ended the discussion, but Kovacs reported it to his supervisor.

Later that day, Great Coastal's general manager asked Ellington about the Annapolis meeting. During their conversation, Kovacs' shop supervisor entered the room and said, "[W]hat is this I hear about you trying to bribe Joe Kovacs into turning the truck up?" Ellington denied any attempt to bribe Kovacs. He was told, "take your stuff out of your truck" and not to attend the drivers' meeting on September 5.

At the September 5 meeting, which Ellington did not attend, a Great Coastal supervisor addressed the assembled drivers concerning the company's policy with respect to "r.p.m." settings. He said, "[Y]esterday a driver tried to bribe one of my mechanics to turn his truck up, and he is no longer with us." After the meeting,

several drivers asked the supervisors who had been fired and were told that Ellington was the driver referred to.

On September 8, Ellington, accompanied by his wife, went to Great Coastal's office to inquire concerning his employment. The general manager told him he had been terminated "because he attempted to bribe Joe Kovacs to change the 'r.p.m.'s.' " Mrs. Ellington asked if he wanted to use the word "bribery." The manager replied that he would "write it down" if she wanted him to.

Ellington brought this action against Great Coastal for defamation. A three-day jury trial resulted in a verdict for Ellington in the amounts of $20,000 compensatory damages and $50,000 punitive damages, the full amounts sued for. At trial, neither Ellington nor Kovacs, the sole witnesses to the conversation between them, testified to any effort to bribe, and Great Coastal offered no other evidence of bribery. Ellington testified that he was still unemployed and had made about forty good-faith but unfruitful applications for work since Great Coastal discharged him. He did not contend that his reputation had been injured, but testified, "I feel like I've been embarrassed and humiliated." The court entered judgment on the verdict, and we granted Great Coastal an appeal.

## I.   *Words Actionable Per Se.*

Great Coastal argues that the court erred in instructing the jury that, because "commercial bribery" is a crime in Virginia,[1] the words allegedly spoken were slanderous *per se* and that damages for embarrassment and humiliation would be presumed without proof of pecuniary loss.

At common law, defamatory words which are actionable *per se* are:

(1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.

---

[1] (1) Any person who gives, offers or promises to an agent, employee or servant any gift or gratuity whatever, without the knowledge and consent of the principal, employer or master of such agent, employee or servant, with intent to influence his action to the prejudice of his principal's, employer's or master's business;

. . . .

shall be guilty of a Class 3 misdemeanor.
Code § 18.2-444(1).

(2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society.

(3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.

(4) Those which prejudice such person in his or her profession or trade.

All other defamatory words which, though not in themselves actionable, occasion a person special damages are actionable.

*Fleming* v. *Moore*, 221 Va. 884, 889, 275 S.E.2d 632, 635 (1981). (Because *Fleming* came before us a second time as a part of *The Gazette* v. *Harris*, hereinafter cited, the first *Fleming* case will be referred to as *Fleming I.*)

Great Coastal, citing Restatement (Second) of Torts § 571 (1976), argues that in order to fall within the first category of words actionable *per se*, above, the words must impute a crime which is either "punishable by imprisonment in a state or federal institution" or "regarded by public opinion as involving moral turpitude."

Because "commercial bribery" is not punishable by imprisonment of any kind, Great Coastal focuses upon the question whether the offense is one which is regarded in public opinion as involving moral turpitude. Great Coastal points out that the offense was unknown at common law and that any question of its relative seriousness in the public perception is an issue of fact for the jury, not properly determined by the court.[2]

In characterizing misdemeanors for the purpose of determining whether they may serve as the basis for impeachment of witnesses, we have defined a crime involving moral turpitude as " 'an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' " *Tasker* v. *Commonwealth*, 202 Va. 1019, 1024, 121 S.E.2d 459, 463 (1961) (*quoting Parr* v. *Commonwealth*, 198 Va. 721, 724, 96 S.E.2d 160, 163 (1957)).

---

[2] This question did not arise in *Fleming* v. *Moore, supra.* There, counsel for the defendant conceded that the trial court, rather than the jury, should determine whether the published words were libelous *per se*. 221 Va. at 889, 275 S.E.2d at 635.

We specifically held in *Bell* v. *Commonwealth*, 167 Va. 526, 538, 189 S.E. 441, 447 (1937), that the question whether a misdemeanor involved moral turpitude was to be determined by the trial judge rather than by the jury. Similarly, we have not hesitated to resolve the question on appeal as a matter of law. *Id.* at 538, 189 S.E.2d at 447 (petty larceny involves moral turpitude); *C. & O. Ry. Co.* v. *Hanes, Adm'r.*, 196 Va. 806, 813, 86 S.E.2d 122, 126 (1955) (making false statement to obtain unemployment benefits involves moral turpitude); *Pike* v. *Eubank*, 197 Va. 692, 700, 90 S.E.2d 821, 827 (1956) (drunkenness and illegal possession of liquor do not); *Burford* v. *Commonwealth*, 179 Va. 752, 766, 20 S.E.2d 509, 514 (1942) (assault and battery does not); *Parr*, 198 Va. at 725, 96 S.E.2d at 164 (gambling does not); *Tasker*, 202 Va. at 1025, 121 S.E.2d at 463-64 (contributing to the delinquency of a minor may or may not involve moral turpitude, depending on facts shown by record on which conviction was based).

■ It is difficult, if not impossible, to prove with mathematical precision the quantum of damages for injury to reputation, humiliation, and embarrassment which may flow from a defamation. For this reason, the common law, as early as 1670, modified the usual standard of proof of damages in those cases where the words uttered were actionable *per se. Dun & Bradstreet, Inc.* v. *Greenmoss Builders*, 472 U.S. ___, ___, 105 S.Ct. 2939, 2946 (1985). In determining whether allegedly defamatory words impute a crime involving moral turpitude, so as to be actionable *per se*, the trial court must make a determination characterizing the imputed crime as a matter of law. In so doing, the court's ruling is similar to that which must be made to characterize misdemeanors for purposes of impeachment. We do not agree with Great Coastal's contention that the determination whether the imputed crime involves moral turpitude should be left to the jury's determination.

■ In making such a ruling, the trial court is in a better position than the jury to determine whether the imputed offense is *malum in se* or *malum prohibitum*, to review any common-law or legislative history of the offense, and to consider the punishment prescribed and the nature of other offenses with which it may be grouped in the statutory scheme. In this last regard, it was apparent to the trial court that the offense of "commercial bribery" has been included in Title 18.2, ch. 10 of the Code, entitled "Crimes Against the Administration of Justice." The first article of that chapter is captioned "Perjury." The second article, which includes

the offense under consideration, is captioned "Bribery and Related Offenses." We hold that the court did not err in making this determination as a matter of law and that it correctly characterized "commercial bribery" as an offense involving moral turpitude so as to be the subject of defamation *per se*.

## II. *Presumed Compensatory Damages.*

The law of defamation has been in a continuing state of evolutionary change since *New York Times* v. *Sullivan*, 376 U.S. 254 (1964). We reviewed these changes and harmonized the Virginia law of defamation with the federal constitutional considerations articulated by the Supreme Court in *New York Times* and its progeny in our recent decision in *The Gazette* v. *Harris*, 229 Va. 1, 325 S.E.2d 713, *cert. denied*, 473 U.S. ____, 105 S.Ct. 3513 (1985) and 473 U.S. ____, 105 S.Ct. 3528 (1985), where we decided four appeals in one opinion. When *Gazette* was handed down, on February 1, 1985, the controlling decision of the Supreme Court in this area was *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974).

In *Gertz*, a libel action by a private plaintiff against a news-media defendant involving a matter of public concern, the Court held that the First Amendment prohibits an award of presumed damages unless the plaintiff shows that the defendant knew the publication to be false or evidenced reckless disregard for the truth, *i.e.*, "*The New York Times* malice."[3] Great Coastal relied upon *Gertz* at trial and on appeal in support of its contention that the trial court erred in instructing the jury that damage for humiliation and embarrassment were to be presumed because the court

---

[3] "[K]nowledge that [the publication] was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. 254 at 280. *New York Times* refers to this as "actual malice." *Id.* at 279. That term is particularly confusing, however, because many decisions, including our own, have used "actual malice" to describe common-law malice, a different and broader concept. *See, e.g., Preston* v. *Land*, 220 Va. 118, 120, 255 S.E.2d 509, 511 (1979). Common-law malice is defined as "some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff." *Preston*, 220 Va. at 120-21, 255 S.E.2d at 511. Thus, *New York Times* malice focuses only upon knowledge of falsity or reckless indifference to falsity. Common-law malice includes that element, but also includes matters related to the speaker's motive and mental state. Not wishing further to complicate a branch of the law already sufficiently vexed by two competing species of malice, we shall hereinafter refer to them by the foregoing names, avoiding "actual malice," which may describe either.

had determined, as a matter of law, that the words allegedly spoken were actionable *per se.*

In *Newspaper Publishing Corp.* v. *Burke*, 216 Va. 800, 803, 224 S.E.2d 132, 135 (1976), a libel action by a private plaintiff against a news-media defendant, and our first decision in this area after *Gertz*, we applied the *Gertz* rule which prohibits presumed damages in the absence of *New York Times* malice. In *Fleming I*, we decided that *Gertz* did not control a case involving a non-media defendant, although we adopted that part of its reasoning which related to punitive damages as a matter of state law. In *Gazette*, we referred to the impact of *Gertz* on presumed damages but had no occasion to apply that part of the *Gertz* rule because none of the four appeals then under consideration involved words actionable *per se.*

On June 26, 1985, subsequent to our decision in *Gazette* and after the present case had been argued on appeal, the Supreme Court, in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders*, 472 U.S. ____, 105 S.Ct. 2939 (1985), substantially modified *Gertz* by a plurality opinion in which three justices joined, and with which two justices concurred by separate opinions. *Dun & Bradstreet* involved a libel action by a construction contractor against a credit-reporting agency for publishing a false report that the contractor had petitioned for bankruptcy. Noting that *New York Times* and all its progeny through *Gertz* had dealt with defamatory statements regarding matters of public or general interest, where the First Amendment protections of free speech and freedom of the press were at their strongest, the Court in *Dun & Bradstreet* observed that speech on matters of purely private concern was of less First Amendment concern. *Dun & Bradstreet* holds that, "in light of the reduced constitutional value of speech involving no matters of public concern, . . . the state interest [in compensating private individuals for injury to reputation] adequately supports awards of presumed and punitive damages—even absent a showing of [*New York Times*] malice." 472 U.S. at ____, 105 S.Ct. at 2946.

The Supreme Court's decision in *Dun & Bradstreet*, like ours in *Gazette*, draws no distinction between media and non-media defendants. Rather, it makes clear that the question whether to apply the *Gertz* rule prohibiting presumed damages in the absence of *New York Times* malice depends not on the status of the defendant, but rather upon the nature of the defamatory words.

■ In *Dun & Bradstreet*, the Court reiterated its language in *Gertz*, that the states' interest in protecting the reputation of private individuals from injury was "strong and legitimate" and that "[a] state should not lightly be required to abandon it." *Dun & Bradstreet*, 472 U.S. at _____, 105 S.Ct. at 2944-45. Because we fully subscribe to this view, we will not, as a matter of state law, apply to speech actionable *per se*, involving no matters of public concern, the *Gertz* rule inhibiting presumed compensatory damages.[4] For the policy reasons discussed in *Fleming I*, we will continue to adhere to the rule of *Gertz* which requires proof of *New York Times* malice for the recovery of punitive damages in all cases. *Fleming I*, 221 Va. at 893, 275 S.E.2d at 638.

■ Accordingly, we hold that in an action brought by a private individual for defamatory words involving no matters of public concern, if the published words are determined by the trial judge to be actionable *per se* at common law, compensatory damages for injury to reputation, humiliation, and embarrassment are presumed. Thus, the trial court committed no error in so instructing the jury.

### III. *The Virginia Standard of Fault for Compensatory Damages.*

■ In *Gazette*, considering the balance struck by the Supreme Court between the First Amendment's guarantees of freedom of speech and of the press and the state's legitimate interest in protecting private individuals from wrongful injury to reputation, we adopted a negligence standard as a predicate upon which a private individual might recover compensatory damages for a defamatory publication. We held that such a plaintiff might recover compensatory damages upon proof, by a preponderance of the evidence, "that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Id.* at 15, 325 S.E.2d at 725. This standard was made applicable to actions against media and non-media defendants alike, where the plaintiff was neither a public official nor a public figure. The neg-

---

[4] This is consistent with our holding in *Burke*. That case involved a statement of *public* concern, and our application there of the *Gertz* rule inhibiting presumed compensatory damages comports with the distinction made by *Dun & Bradstreet*. 216 Va. at 803.

ligence standard, however, applies only to circumstances where the defamatory statement makes substantial danger to reputation apparent, a determination to be made by the trial judge. Where no such danger is apparent from the statement, the plaintiff may recover compensatory damages only upon proof of *New York Times* malice. *Id.* at 15, 325 S.E.2d at 725.

We continue to adhere to the foregoing rules. Accordingly, our reiteration of the common-law principle that compensatory damages are presumed where words actionable *per se* are published does not mean that we have imposed liability without fault. A private plaintiff must still prove negligence as a predicate for recovery, even if the words published are actionable *per se*. A plaintiff who proves the publication of words actionable *per se* is simply relieved of the necessity of proving the quantum of his damages for injury to reputation, humiliation, and embarrassment.

We decided *Gazette* long after the trial in this case, and, of course, no jury instruction on negligence was requested or given. We observed in *Gazette*, in the context of qualified privilege, that where malice is shown, the negligence standard is subsumed in the higher malice standard. 229 Va. at 18, 325 S.E.2d at 727. As will be set forth below, the jury made findings of both common-law malice and *New York Times* malice in this case. Accordingly, the lack of a negligence instruction is harmless. Ellington carried more than his requisite burden to establish a predicate for the recovery of compensatory damages.

## IV. *Punitive Damages.*

In *Fleming I*, as noted above, we determined that although federal constitutional law did not control the case then before us, we would nevertheless incorporate, as the Virginia predicate for the assessment of punitive damages in a defamation case, a requirement that the plaintiff must show *New York Times* malice by clear and convincing evidence. 221 Va. at 893, 275 S.E.2d at 638. We reiterated this holding in *Gazette*, 229 Va. at 13, 325 S.E.2d at 724. The trial court correctly so instructed the jury in the case before us. The evidence was sufficient to support the jury's finding, by clear and convincing evidence, that the words were spoken with *New York Times* malice.

## V. *Qualified Privilege.*

We noted in *Gazette* that the common-law defense of qualified privilege survives in defamation actions in Virginia. 229 Va. at 18, 325 S.E.2d at 727. "A communication, made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral, or social, is qualifiedly privileged if made to a person having a corresponding interest or duty." *Taylor* v. *Grace*, 166 Va. 138, 144, 184 S.E. 211, 213 (1936). It is for the court, not the jury, to determine whether a privilege exists, whether it is qualified or absolute, and so to instruct the jury. *Aylor* v. *Gibbs*, 143 Va. 644, 648, 129 S.E. 696, 697 (1925). At trial, Ellington conceded that the words were spoken on a privileged occasion and the jury was so instructed. The court further instructed the jury, however, that the privilege was lost if the jury found, from a preponderance of the evidence, that the alleged words were spoken:

1. With actual malice [not defined here, but defined in another instruction as *New York Times* malice]; or

2. And [sic] even though believing the alleged words to be true, he used language which was intemperate or disproportionate in strength and violence to the occasion and which was unnecessarily defamatory of the plaintiff; or

3. Not in good faith, and without an honest belief in their truth; or

4. Deliberately adopted a method of speaking the alleged words which gave unnecessary publicity to such words; or

5. And [sic] purposely arranged to speak the alleged words in the presence of a person or persons who were wholly uninterested in the matter and who had no right to be present and who in the natural course of things would not have been present; or

6. For the purpose of gratifying some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or

7. With such gross indifference or recklessness as to amount to a wanton and wilful disregard of the rights of the plaintiff;

then the defendant abused the privilege which might otherwise have attached to the occasion.

This instruction incorporates language used in a number of our earlier cases which discuss various elements of common-law malice and abuse of privilege. It also incorporates the elements of *New York Times* malice.

## VI. *Loss of Privilege.*

██ Great Coastal, citing decisions from other jurisdictions, contends that a qualified privilege, in the present state of the law, may only be lost if the plaintiff proves *New York Times* malice by clear and convincing evidence, arguing by analogy that such is the standard for the recovery of punitive damages. We agree that the burden of proving malice for the purpose of defeating a qualified privilege is by clear and convincing evidence, and that the quoted instruction was erroneous in setting the burden at a preponderance.[5] It is important, we think, that juries not be confused in these cases by two different burdens of proof of malice, one pertaining to the defeat of a qualified privilege, the other pertaining to punitive damages.

██ We do not agree, however, that only proof of *New York Times* malice will suffice. We held in *Gazette*, that proof of common-law malice will defeat a qualified privilege, 229 Va. at 18, 325 S.E.2d at 727 (citing *Story* v. *Newspapers, Inc.*, 202 Va. 588, 590, 118 S.E.2d 668, 670 (1961)). Great Coastal argues that juries will be confused by instructions on two species of malice in the same case, even if the burden of proving them is the same. But this difficulty is more apparent than real.

██ Instructions on the elements of malice which will serve to defeat a qualified privilege customarily state them in the disjunctive, as in the instruction quoted above. Any one of the elements if proved, will suffice. *New York Times* malice is merely one of the several elements of common-law malice set forth in our earlier de-

---

[5] In fairness to the trial court and counsel, it must be conceded that our prior decisions leave this question open. It was not before the Court and was not adjudicated in *Gazette*. Some of our earlier decisions have implied that the burden was greater than a mere preponderance, but have not expressly so stated. *See, e.g. Rosenberg* v. *Mason*, 157 Va. 215, 249, 160 S.E. 190, 202 (1931); *Chesapeake Ferry Co.* v. *Hudgins*, 155 Va. 874, 907-08, 156 S.E. 429, 441 (1931).

cisions. We held in *Montgomery Ward v. Nance*, 165 Va. 363, 383, 182 S.E. 264, 272 (1935), in *Chesapeake Ferry Co.*, 155 Va. at 908, 156 S.E. at 441, and in *Aylor*, 143 Va. at 655, 129 S.E. at 699, that common-law malice is shown, sufficient to defeat a qualified privilege, by proof that the speaker uttered defamatory words without believing them to be true, or lacked reasonable or probable grounds for believing them to be true. Thus, common-law malice, in Virginia, has long included *New York Times* malice.

A list, in a jury instruction, of every element of common-law malice which might serve to defeat a privilege, or every conceivable abuse which might cause it to be lost, would probably go far beyond the evidence of any particular case. It is elementary that no instruction should be given which is unsupported by evidence.[6] Thus, if a plaintiff has sought to prove only spite or ill will, those elements alone should be included. If a plaintiff offers proof of the knowing publication of a falsehood, as Ellington did here, that element should be included, and *New York Times* malice will become a part of the instruction, along with any other elements of malice proved.

No confusion will result between instructions on proof required to defeat qualified privilege and proof of punitive damages, because if *New York Times* malice is shown, its elements will appear in the instructions on both subjects, in the same language, and coupled with the same burden of proof. If no *New York Times* malice has been shown, no instruction on punitive damages will be given at all.

As noted above, the jury in this case, responding to a proper instruction, found clear and convincing evidence of *New York Times* malice and awarded punitive damages. This element of malice was included in the instruction quoted above as one of the disjunctive elements of malice by which qualified privilege could be defeated. Thus, the instruction's error regarding the burden of proof was harmless, because the jury necessarily found that the plaintiff had carried the heavier burden of proof by clear and convincing evidence of an element of malice sufficient to defeat the privilege.

---

[6] The instruction given in this case, quoted above, clearly suffers from this defect to some extent. No question has been presented on appeal in that respect, however, and we will not regard it further.

## VII.  *Appellate Review.*

Because punitive damages were awarded, it is our duty, on appeal, to make an independent determination whether the evidence in the record is sufficient to support a finding of *New York Times* malice by clear and convincing proof. *Bose Corp.* v. *Consumer's Union*, 466 U.S. 485, 513 (1984); *Gazette*, 229 Va. at 19, 325 S.E.2d at 727-28. We have done so, and find that the record sufficiently supports the jury's verdict.

The gravamen of Ellington's action was that he was falsely accused of bribery, on three occasions, by officers of Great Coastal, each of whom knew, at the time of publishing those accusations to third persons, that they were untrue. In this regard, neither Ellington nor Kovacs testified to any effort by Ellington to offer a bribe in any form. There were no other witnesses to their conversation, and Great Coastal offered no evidence to show that Ellington had attempted bribery. Rather, it defended the case by seeking to prove that its officers had not spoken the words alleged, a version which the jury, after hearing the conflicting evidence, rejected. Thus, on the record, the jury could only have found that the words were spoken with knowledge of their falsity or with a reckless disregard for the truth.

Great Coastal further argues that the damages were excessive, and resulted from "sympathy, bias and passion of the jury." Compensatory damages for humiliation and embarrassment were presumed, as stated above. The court properly instructed the jury that, in order to recover damages for the loss of his job, which were not presumed, Ellington had the burden of proving by a preponderance of the evidence both the quantum of his loss and that the defamatory words were its proximate cause. We do not find either the compensatory damages or the punitive damages excessive, or insufficiently related.

For the reasons stated, the judgment will be

*Affirmed.*