## CIRCUIT COURT OF STAFFORD COUNTY

Linda L. Hargrave

v.

William C. Tignor

August 6, 1991

Case No. (Law) 9503-FB

By JUDGE JAMES W. HALEY, JR.

William C. Tignor has moved the court for summary judgment in a slander action filed against him by Linda L. Hargrave. The parties have agreed the motion should be determined upon the pleadings, stipulation of facts, and products of discovery.

The original motion for judgment in this case was filed on September 21, 1984, and named as defendants the Commonwealth of Virginia, Tignor, individually and as Director of the Stafford County Department of Social Services, and the Public Welfare Board of Stafford County. It was claimed the alleged slander had been made to seven different entities. Various pre-trial motions have eliminated all defendants except Tignor individually and reduced recipients of the alleged slander to an employee of the Department of Social Services of the City of Newport News.

### Facts

From July, 1975, until August, 1979, when she resigned, Hargrave served as an eligibility worker for the Stafford County Public Welfare Department, of which Tignor was

the Director.[1] Thereafter, Hargrave filed an application for employment in a similar capacity with the Department of Social Services of the City of Newport News. On November 17, 1983, Debbie Doxey (now Debbie Taylor), an employee of that agency evaluating the application, called Tignor and made inquiry as to Hargrave's prior job performance.

The parties have stipulated the testimony of Tignor and Doxey as follows:

> Tignor: William C. Tignor (hereinafter Tignor) would state that he worked with Hargrave from December, 1975, through August, 1979, when Hargrave resigned. That from November, 1976, through the present, he was, and is, Director of Public Welfare and Director of Social Services for the County of Stafford. That in March, 1979, Tignor reprimanded Hargrave, both orally and by letter, for insubordination, noting one specific incident in February, 1979, in which she cursed at Tignor and also noting that "other such incidents subsequent to this have been reported to me and observed by me," including "conflicts with other staff members, incidents in which she refused to take appointments, other agency staff that were reluctant to ask her to do things because of the reaction that they would get from her." Tignor would further state that "there were notes taken by the -- supervisor (Esther Jarrell) concerning . . . incidents. There were complaints not only from clients, but . . . complaints from legal aid people." Tignor would further state that during the last "seven or eight months" of Hargrave's employment in Stafford, her immediate supervisor, Mrs. Jarrell, "on many occasions related to me complaints with Ms. Hargrave's disrespectful attitude about her being the cause of conflicts with other workers, about complaints from clients about

---

[1] The Virginia Employment Commission made a final determination that due to her misconduct, Hargrave was not entitled to unemployment benefits as a result of her employment by the Department of Public Welfare of Stafford County.

her attitude, about her being rude and condescending towards her clients." Finally, as to the telephone conversation with Doxey, Tignor would state as follows:

"I recall being asked some routine questions which are asked in work references about the person's understanding of the eligibility policy, their -- willing -- I mean their ability to be organized in their work and meet the deadlines, how did they adjust to the new and changing policy which happens all the time in eligibility work. My response was positive in all those respects. And then I recall being asked the question would I rehire the employee. And my response was, after a pause, that no, I would not, and that there had been problems associated with her employment here, and that I would not rehire her. And that -- that she had -- worked in another Social Service Department since she had worked for us, and that they would be perhaps a better source of information and certainly a more current one. And that our experiences after four and a half years (4½) -- I thought it was four and a half years at that time -- should not necessarily preclude her ability to be a successful employee somewhere else. I just said there were conflicts with her supervisor and other personnel."

Tignor would also state that he harbors no malice or ill will towards Hargrave and did not harbor any malice or ill will towards her on or about November 17, 1983.

Doxey: Deborah R. Doxey (hereinafter Doxey) would testify on or about November 17, 1983, she was an eligibility supervisor for the Department of Social Services for the City of Newport News, Virginia. As such, she participated in an interview of Linda L. Hargrave (hereinafter Hargrave) as a candidate for employment in the Newport News Department of Social Services. On or about November 17, 1983, and as part of the interview process, Doxey initiated a telephone

call to William C. Tignor (hereinafter Tignor) as a former employer of Hargrave . . . Doxey would also state that during the telephone conversation, she received no impression of any malice or any feeling that Tignor "was out to get" Hargrave, and that if there had been a particular tone, anger, or anything like that, she probably would have remembered it.

After concluding her phone conversation of November 17, 1983, Doxey immediately summarized the conversation in note form. Hargrave had admitted this writing, which follows, is the only documentary evidence of any alleged slander:

Mr. Tignor stated that Ms. Hargrave's work performance was always very satisfactory. He said she had a "great deal of ability and she can do the work." He said she kept her caseload up to date, carried a generic caseload, and had good program knowledge. But he said there was personality differences and problems between Ms. Hargrave and the other staff, her supervisor especially and myself to some degree. He said the situation became very tense and that it led to her leaving. Mr. Tignor said that Ms. Hargrave's actual work performance was not a factor. He said he would not rehire her because of the personality difference. He could not offer an opinion as to whether the same problems would occur if she worked in another agency and suggested that I contact the agency she worked for since she left Stafford.

The parties have stipulated the testimony of three contemporaneous co-workers at Stafford Public Welfare. This testimony reveals a "problem" or "tension" between Hargrave and her immediate supervisor, Esther Jarrell, a claim by Jarrell that Hargrave was "insubordinate," and accusations by Hargrave against co-workers of doing personal matters on work time.

Hargrave alleges in an Amended Motion For Judgment that Tignor on November 17, 1983:

then and there falsely and maliciously spoke and published certain defamatory words following, that is to say, "she" (meaning the plaintiff) "did not get along with the staff, including her supervisor, and "me" (referring to the staff of the Stafford County Department of Social Services and himself as Director) and "she, (referring to the plaintiff), "was a real problem" and "was insubordinate and insolent," meaning thereby to state that the plaintiff was difficult to get along with and had a difficult, offensive and disagreeable personality and manner and was a disruptive influence on staff members and fellow employees and further, meaning that the plaintiff was insolent and insubordinate.

The plaintiff is neither a public official nor a public figure. The defendant has no connection with the news media. The alleged slander does not involve a matter of public concern.

*Law*

The Supreme Court in *Smalls v. Wright*, 241 Va. 52, 54, 399 S.E.2d 805, 807 (1991), stated:

a communication, made in good faith on a subject in which the communicating party has an interest or owes a duty, is qualifiedly privileged if the communication is made to a party who has a corresponding interest or duty. *Great Coastal Express v. Ellington*, 230 Va. 142, 153, 334 S.E.2d 846, 853 (1985); *Taylor v. Grace*, 166 Va. 138, 144, 184 S.E. 211, 213 (1936). It is the function of a court, not a jury, to decide whether a communication is qualifiedly privileged. *Ellington*, 230 Va. at 153, 334 S.E.2d at 853; *Aylor v. Gibbs*, 143 Va. 644, 648, 129 S.E. 696, 697 (1925) . . . .

*See also, Chaffin v. Lynch*, 83 Va. 106, 110, 1 S.E. 803, 810 (1887); *Strode v. Clement*, 90 Va. 553, 555, 19

S.E. 177, 178 (1894); *Synder v. Fatherly,* 153 Va. 762, 764, 151 S.E. 149, 150 (1930).

In *Williams Printer Co. v. Saunders,* 113 Va. 159, 176, 73 S.E. 472, 476 (1912), the Supreme Court stated:

> Privileged communications . . . [include] . . . anything said or written by a master in giving the character of a servant who has been in his employment . . . .

The court in *Kroger Company v. Young,* 210 Va. 564, 567, 172 S.E.2d 720, 722 (1970), noted that communications made "by an employer . . . of the reason for discharge of a[n] . . . employee . . ." are qualifiedly privileged. *See also, Peoples Life Ins. Co. v. Talley,* 166 Va. 464, 468, 186 S.E. 42, 44 (1936); *Brown v. Norfolk & W. R. Co.,* 100 Va. 619, 620, 42 S.E. 664, 665 (1902); *Chalkley v. A.C.L. R. Co.,* 150 Va. 301, 306, 143 S.E. 631, 632 (1928).

The commentators support the Virginia case law on the subject. Thus, in 50 Am. Jur. 2d, *Libel & Slander,* sect. 273, p. 791, note 8-11, they conclude:

> It is an established general rule that a communication respecting the character of an employee or former employee is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a definite interest therein . . . So long as good faith is present, the person making the statement is not limited to facts that are within his personal knowledge but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not.

In light of the foregoing, this court holds that all statements made by Tignor upon which Hargrave relies as forming the basis of her claim are qualifiedly privileged.

A qualified privilege is overcome if it can be shown by clear and convincing evidence the statement or writing was actuated with any of the disjunctive elements of "common law malice." *Great Coastal Express v. Ellington,* 230 Va.

142, 154-155, 334 S.E.2d 846, 854 (1985); *The Gazette
v. Harris*, 229 Va. 1, 18, 325 S.E.2d 713, 727, cert. denied
*sub nom., Fleming v. Moore*, 472 U.S. 1032, 473 U.S. 905
(1985), cert. denied, 479 U.S. 890 (1986):

Common law malice exists where:

(1) the defendant knew the statement was false or made it with reckless disregard of whether it was false or not; or

(2) the statement was deliberately made in such a way that it was heard by persons having no interest or duty in the subject of the statement; or

(3) the statement was unnecessarily insulting; or

(4) the language used was stronger or more violent than was necessary under the circumstances; or

(5) the statement was made because of hatred, ill will or a desire to hurt the plaintiff rather than as a fair comment on the subject.

*Smalls, supra*, at 241 Va. at 55, 399 S.E.2d at 808. *New
York Times* malice[2] is the first numbered disjunctive element
of common law malice set forth above. *See, Great Coastal,
supra*, footnote 3, 230 Va. at 149, 344 S.E.2d at 851.[3]

Clear and convincing evidence is:

that degree of proof which produces in the mind of the trier of facts a firm belief or conviction upon the allegations sought to be established. *Oberbroeckling v. Lyle*, 234 Va. 373, 379, 362 S.E.2d 682, 685 (1987).

---

[2] The language used by the United States Supreme Court was "knowledge that [the publication] was false or with reckless disregard of whether it was false or not." New York Times v. Sullivan, 376 U.S. 254, 280, 84 S. Ct. 710, 726, 11 L. Ed. 2d 868 (1964).

[3] The court in Great Coastal here suggests that it is the better practice for purposes of clarity to refer to "common law malice" rather than "actual malice."

Tignor has moved the court for summary judgment pursuant to Rule of Court 3:18 "on the issue of liability alone . . ." The court may act upon such a motion if there are no material facts in dispute. *Day v. Abernathy*, 204 Va. 723, 133 S.E.2d 299 (1963). As noted above, the parties have agreed the facts recited above, as supplemented by the pleadings and the products of discovery, are complete and undisputed.

In *Preston v. Land*, 220 Va. 118, 121, 255 S.E.2d 509, 511 (1979), the court reaffirmed the following:

> In *Rosenberg v. Mason*, 157 Va. 215, 249, 160 S.E. 190, 202 (1931), we explicated the nature of the plaintiff's burden:
> "It is not sufficient . . . that the evidence be consistent with the existence of actual malice, or even that it raise a suspicion that the defendant might have been actuated by malice or a doubt as to his good faith. It must affirmatively prove the existence of actual malice, and to do so, it must be more consistent with the existence of actual malice than with its nonexistence, and at least raise a probability of its existence."

In 1931 the Supreme Court stated in *Chesapeake Ferry Co. v. Hudgins*, 155 Va. 874, 907, 156 S.E. 429, 441 (1931), that:

> Evidence which does no more than raise a suspicion that he *might* have been actuated by malice or only a doubt as to the good faith of the defendant is, as a matter of law, not sufficient to . . . establish the existence of malice. The evidence must affirmatively prove malice (emphasis in original).

*See also, Peoples Life Ins. Co. v. Talley*, 166 Va. 464, 468, 186 S.E. 42, 44 (1936).

In *Marsh v. Commercial & Savings Bank*, 265 F. Supp. 614, 621 (W.D. Va. 1967), the United States District Court quoted from *National Disabled Soldiers' League v. Haan*,

55 App. D.C. 243, 4 F.2d 436, 441 (1925), as follows:

> If the plaintiff fails to offer evidence of extrinsic nature to prove actual malice on the part of the defendant in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstance attending its publication are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

Finally, in *Dwyer v. Smith*, 867 F.2d 184, 195 (4th Cir. 1984), the court concluded:

> While determinations of ill-will and common law malice in defamation actions are generally made by the jury, it is proper for the court to direct a verdict because there was no evidence in the record to support the necessary contrary conclusion.

Applying the stipulated facts to the standards set forth herein, this court holds as a matter of law that the plaintiff cannot meet the evidentiary burden to sustain her cause. Accordingly, the motion for summary judgment is granted.