Present:  Hassell, C.J., Lacy, Keenan, Koontz, Lemons, and Agee, JJ.

UNION OF NEEDLETRADES, INDUSTRIAL
 AND TEXTILE EMPLOYEES, AFL-CIO

                                        OPINION BY
v.  Record No. 032757        JUSTICE LAWRENCE L. KOONTZ, JR.
                                      November 5, 2004
CECIL N. JONES

            FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
                      John W. Scott, Jr., Judge


     The dispositive issue in this appeal involving an action

for common law defamation is whether the evidence adduced at

trial shows that the alleged defamatory statement was false.

                            BACKGROUND

     The extensive record in this case contains depositions,

oral testimony, and lengthy exhibits introduced in evidence

during a three-day jury trial.  Because of the view we take

regarding the dispositive issue presented on appeal, we will

limit our recitation of the facts to those material to our

resolution of that specific issue.

     Union of Needletrades, Industrial and Textile Employees,

AFL-CIO is an international union that resulted from a 1995

merger of the Amalgamated Clothing and Textile Workers Union and

the International Ladies' Garment Workers Union.  Although many

of the background events pertinent to this appeal occurred prior

to this merger in 1995, for brevity we will refer to this union

as "UNITE" throughout this opinion with the understanding that,

in context, at times one of its predecessor unions is intended. In addition, it is to be understood that "Local 713" references a local union affiliate of UNITE or its predecessor.

Local 713 originally represented workers at a Sylvania cellophane plant in the Fredericksburg area. In 1954, members of Local 713 formed Sylvania Employees, Inc. in order to purchase a local building to serve as a union hall. In addition to providing space for union offices and meetings, the building was sufficiently large to afford the union rental income from various commercial occupants.

In 1973, UNITE hired Cecil N. Jones to work as a union organizer in the Fredericksburg area. Jones initially worked with R. Warwick Daniel, UNITE's representative at Local 713, and in 1985 assumed the duties of union representative upon Daniel's retirement. Jones remained union representative at Local 713 until his own retirement in February 1997. During Jones' term as the union representative at Local 713, he was directly responsible to Bruce A. Dunton, the director of UNITE's Mid-Atlantic Regional Joint Board and a member of UNITE's General Executive Board.

In 1978, the Sylvania plant closed. Daniel and Jones successfully organized a new union shop at Webster Brick, which subsequently was acquired by General Shale Products Corp. (General Shale). The new union at Webster Brick/General Shale

2

continued to be designated as "Local 713" and to use the union hall for its meetings and business operations. Thereafter, Sylvania Employees, Inc. was voluntarily dissolved, and by deed dated February 11, 1982 the union hall was conveyed in trust to Daniel and three officers of Local 713 at Webster Brick/General Shale.

Daniel and Jones subsequently organized two other union shops at manufacturing plants in the Fredericksburg area. These local unions were both designated as "Local 713." One of the disputes between the parties is whether these two local unions were independent of the local union at Webster Brick/General Shale, as Jones maintains, or whether all three shops were jointly organized and designated Local 713 as a single local union, as UNITE contends.[1] It is not disputed, however, that each local union was an affiliate of UNITE, and that its union dues and other monies were deposited in a single bank account maintained by Daniel and subsequently by Jones. Jones contended that the funds of each local union were separately accounted for

---

[1] For purposes of our resolution of this appeal we need not resolve that dispute. We note it only because UNITE's position that Local 713 was a multi-employer local was part of the basis for UNITE's actions that ultimately spawned this defamation suit by Jones.

in bookkeeping records of Local 713 at Webster Brick/General Shale.

On May 15, 1985, the union members of Local 713 at Webster Brick/General Shale adopted a resolution regarding the future ownership of the union hall and certain bank accounts. In pertinent part, the resolution provided that these assets "shall continue under the control and ownership of the local . . . so long as Warwick Daniel and/or Cecil Jones shall maintain an active interest in the local and at such time as Daniel and/or Jones cease to be interested in the local then it is the intent of the membership that [the union hall] and funds being held by the local shall become the property of the Mid-Atlantic Regional Joint Board" of UNITE.

Although it appears that for most of his employment with UNITE Jones maintained good relations with Dunton, beginning in 1996 an apparent dispute arose between the two concerning Jones' role in the control of the union hall and the accumulated union funds. In response, the officers of Local 713 at Webster Brick/General Shale, in a resolution and two letters to Dunton, expressed confidence in Jones as the local's "business agent" and rejected a request from Dunton that Jones be required to turn over the keys to his office in the union hall. In January 1997, while negotiations for a new contract were ongoing, General Shale, which by that time had acquired Webster Brick,

4

withdrew recognition of Local 713 on the ground that the union no longer represented the majority of the employees at its plant. Although denied by Dunton, Jones would later maintain that Dunton had deliberately delayed contract negotiations with General Shale to enable the company to withdraw recognition of the union.

During this same time, Dunton became concerned about the management of Local 713 because it appeared to him that the assets of Local 713 were under the control of Jones and the officers of the local union at General Shale, with no oversight by its members and with no input from the union members at the other two shops. Accordingly, on January 23, 1997, Dunton sent a letter to Jay Mazur, the President of UNITE, as a follow-up to a telephone conversation the two had concerning this matter. In that letter, Dunton stated that Jones would be retiring in about a month, that Jones "has had responsibility for [Local 713's] funds and shop for many years," and that "four (4) people control approximately $65,000, as well as the assets of the building, which should all be in the Region." Dunton further stated that a "review of the Cash Reports indicates questionable expenditures." Dunton recommended that UNITE temporarily take control of Local 713 by appointing an administrator as authorized by UNITE's constitution.

5

On January 30, 1997, the Executive Committee of UNITE's General Executive Board adopted a resolution to appoint Harold L. Bock, the associate director of UNITE's Mid-Atlantic Regional Joint Board, as administrator "to take possession of and administer the affairs, funds and property of Local 713 and to assume and perform the duties of its officers." The resolution stated that "information has been made available to the [General Executive Board] indicating that financial malpractice has occurred with respect to the assets of Local 713." The resolution also appointed a union official to serve as a hearing officer and directed him to conduct a hearing on the matter and to prepare a report for consideration by the General Executive Board.

On the next day, UNITE's secretary-treasurer sent a letter to the president and three other officers of Local 713 at General Shale advising them that UNITE had assumed control of the local union and its assets pending the review by the hearing officer. A copy of the resolution was enclosed with the letter. Neither the resolution nor the letter expressly identified Jones by name or otherwise indicated that he had committed "financial malpractice."

The hearing was conducted on November 18, 1997. The hearing officer, after noting that Local 713 was a "multi-employer local" and that General Shale was not under contract

with UNITE, recommended that the administratorship be terminated after the election of new officers of Local 713. Although the hearing officer expressed "concerns about the finances of Local 713," he concluded that there was no evidence of financial malpractice, or wrongdoing, by Jones or anyone else. By the time this hearing concluded, Jones had retired from UNITE and, consistent with the previously described May 15, 1985 resolution of members of Local 713, the union hall and various bank accounts ultimately became the property of UNITE.[2]

On June 24, 1999, Jones filed a motion for judgment in the Circuit Court of the City of Fredericksburg (the trial court) against Dunton, Bock, and UNITE. In that pleading, Jones asserted that the statement in the January 30, 1997 resolution regarding "financial malpractice . . . with respect to the assets of Local 713" was "totally false," "defamatory per se," and "would be normally understood to apply to [Jones'] conduct and activities." Jones further maintained that "Dunton and/or Bock were the only persons who presented or could have presented

---

[2] Neither the authority of UNITE to appoint an administrator and temporarily assume control of the assets of Local 713 at General Shale nor the justification for doing so are at issue in this appeal. The union hall was eventually sold by UNITE and the proceeds from the sale as well as the other funds made available to the Regional Board.

any information concerning 'financial malpractice' of Local 713 to the General Executive Board."  Jones also alleged that the statements "were made with actual malice, knowledge of their falsity, and/or with reckless disregard for their truth."  Jones sought compensatory damages of $350,000 and punitive damages of a like amount.[3]

After a demurrer to the motion for judgment was denied, UNITE, Dunton, and Bock filed a joint grounds of defense.  On February 12, 2001, the trial court entered an order dismissing Bock from the action with prejudice on Jones' motion.  The case then proceeded through protracted discovery and pre-trial motions until a jury trial commenced in the trial court on April 2, 2003.  In addition to the above-recited evidence, Jones presented evidence through his own testimony and that of three of the officers of the Local 713 at General Shale who had been sent copies of the January 30, 1997 resolution.  In substance, that evidence was intended to show that Jones' reputation had

---

[3] Jones had alleged in a further count of his motion for judgment that Dunton and Bock conspired to injure his reputation in violation of Code § 18.2-499 and sought compensatory damages not to exceed $75,000 and treble damages not to exceed $75,000 under Code § 18.2-500.  However, after Jones stipulated in a pre-trial proceeding that Dunton and Bock were acting in their respective capacities as agents of UNITE, and thus could not be guilty of a conspiracy, the trial court granted summary judgment to the defendants on that issue.

been damaged by the reference to "financial malpractice" in the resolution. The union officers testified that they interpreted this term to mean that Jones was a "crook," because Jones was primarily responsible for managing the assets of Local 713.

At the conclusion of Jones' case-in-chief, UNITE and Dunton moved to strike the evidence. The trial court sustained the motion to strike as to Dunton, apparently agreeing with the argument made by his counsel that the statements made by Dunton in the January 23, 1997 letter to Mazur were matters of opinion or subject to a qualified privilege because they were made within an employment setting and that actual malice had not been proven by a preponderance of the evidence. After denying UNITE's renewed motion to strike at the conclusion of the presentation of its evidence, the trial court permitted the case to go forward as to UNITE.

The jury returned its verdict for Jones, awarding him $150,000 in compensatory damages and $350,000 in punitive damages. UNITE filed a motion to set aside the verdict arguing, among other points, that Jones had failed to prove that the statement at issue in the January 30, 1997 resolution was false.

In a final order entered September 3, 2003, the trial court denied UNITE's motion to set aside the verdict and entered judgment on the jury's verdict, but reduced the amount of punitive damages to $150,000. We awarded UNITE this appeal.

DISCUSSION

The law of defamation with respect to a statement made by a non-media defendant allegedly defaming a private individual is well settled in Virginia. "At common law, defamatory words that prejudice a person in his or her profession or trade are actionable as defamation per se. A defamatory statement may be made by inference, implication or insinuation. However . . . speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." Fuste v. Riverside Healthcare Association, Inc., 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003) (internal citations, emendation, and quotation marks omitted). Thus, the defendant is not required to plead and prove the truth of his statement as an affirmative defense. "Instead, the plaintiff must prove falsity, because he is required to establish negligence with respect to such falsity." The Gazette, Inc. v. Harris, 229 Va. 1, 15, 325 S.E.2d 713, 725 (1985). "The application of this negligence standard is expressly limited, however, to circumstances where the defamatory statement makes substantial danger to reputation apparent." Id.

We frequently have addressed the issue of an alleged defamation within the context of an employment relationship, as

10

is the case here.  Typically in such cases, the allegedly defamatory statement is afforded a qualified privilege because the statement is made "between persons on a subject in which the persons have an interest or duty."  Larimore v. Blaylock, 259 Va. 568, 572, 528 S.E.2d 119, 121 (2000).  In such instances, the plaintiff must establish both that the statement was false and that the defendant acted with actual malice.[4]  Id.; see also Fuste, 265 Va. at 134, 575 S.E.2d at 862-63.  In this context, "actual malice" is "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made."  Gazette, Inc., 229 Va. at 18, 325 S.E.2d at 727; Fuste, 265 Va. at 134-35, 575 S.E.2d at 863. However, in every defamation action the plaintiff's initial burden is to produce sufficient evidence to show that the allegedly defamatory statement was false.  If the plaintiff does not establish the falsity of the statement by a preponderance of the evidence in his case-in-chief, he has not met this threshold

---

[4] Within the context of defamation law, there is also an intermediate standard between simple negligence and actual malice, sometimes referred to as "New York Times malice," wherein the plaintiff need show only that the statement was made with knowledge that it was false or with a reckless disregard for the truth, even if the defendant bore no ill-will toward the plaintiff.  See New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 149, 334 S.E.2d 846, 851 (1985).

burden, and the trial court should strike the evidence and grant summary judgment to the defendant.

UNITE contends that the trial court erred in refusing to grant its motion to strike or its motion to set aside the jury verdict because Jones failed to meet his burden of proving that the statement in the January 30, 1997 resolution that "information has been made available to the [General Executive Board] indicating that financial malpractice has occurred with respect to the assets of Local 713" was false. UNITE contends that this statement did not affirmatively state that "financial malpractice" had occurred, but only that information had been provided to UNITE that indicated such might be the case. This statement was true, UNITE contends, because Dunton had provided such information to UNITE's General Executive Board by way of his letter to Mazur.

In support of that contention, UNITE maintains that the term "financial malpractice," both in the broad meaning of "improper practice," and as a term-of-art applicable to the specific circumstance of a trade union as found in federal law, see, e.g., 29 U.S.C. § 462, and in UNITE's constitution, does not equate with criminal wrongdoing. Rather, UNITE maintains that the term imputes merely mismanagement or improper practice with respect to the fiduciary duties of a union officer. In that context, UNITE contends that the evidence establishes that

12

the statement in the resolution was true because the control of Local 713 assets by Jones and the local union officers under the circumstances of this case indicated that financial malpractice had occurred with respect to those assets.

Jones contends that the statement was false because no information indicating financial malpractice or wrongdoing at Local 713 had been presented to UNITE's General Executive Board at the time the resolution was adopted. He further contends that UNITE's construction of the term "financial malpractice" is unsupported by the record because no evidence was presented to show that the term connotes something other than corrupt or criminal practices. Rather, Jones contends that the only evidence regarding the meaning of the term came from the testimony of the local union members that it implied Jones was a "crook."

We agree with UNITE that the statement in the January 30, 1997 resolution did not affirmatively assert that financial malpractice had occurred at Local 713, but rather, only stated that the General Executive Board had received information indicating that possibility. Moreover, it is clear from the context of the resolution as a whole that the Executive Committee of UNITE's General Executive Board was exercising its power to appoint an administrator under UNITE's constitution in order to investigate the validity of Dunton's information. The

13

question then becomes not whether financial malpractice had occurred in fact, but rather, whether at the time the resolution was adopted the General Executive Board had received credible information to warrant its action.

The parties agree that, on this record, the only source of the information ultimately provided to UNITE's General Executive Board was Dunton's letter of January 23, 1997 to Mazur. As Dunton explained at trial, the "thrust" of that letter was that he had found a small group of people controlling the local's assets without member oversight. In recommending that an administrator be appointed, Dunton undoubtedly drew on UNITE's authority to do so under its constitutional provision to "prevent or correct corruption or financial malpractice" when he referred to financial malpractice. (Emphasis added). Significantly, Dunton did not include a reference or suggestion of "corruption" in his letter or otherwise suggest criminal wrongdoing. Dunton's letter did not assert that financial malpractice, however defined, had in fact occurred. The information contained in Dunton's letter, however, was sufficient to establish the truth of the statement in the resolution that UNITE's General Executive Board had been provided with "information . . . indicating that financial malpractice has occurred." The fact that this "information" subsequently only raised "concerns about the finances of Local

14

713" in the inquiry by the hearing officer does not convert the statement, true at the time of its publication in the resolution, into one that was false and defamatory.

While Jones undoubtedly desired the jury and the trial court to focus attention on the alleged efforts of Dunton to discredit him in order for UNITE to assume the operation of Local 713 and the control of its assets, his cause of action against UNITE was limited to the allegation that he had been defamed by the publication of the January 30, 1997 resolution. Jones failed to prove that the allegedly defamatory statement in that resolution was false.  Accordingly, we hold that the trial court erred in failing to grant UNITE's motion to strike Jones' evidence.

CONCLUSION

For these reasons, we will reverse the judgment of the trial court and enter final judgment for UNITE.

Reversed and final judgment.

15