**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 05-2004**

———————

DAVID E. CONLEY,

                                        Plaintiff - Appellant,

          versus


TOWN OF ELKTON; CATHY H. MURPHY, individually
and in her official capacity as a Council
Member and Vice Mayor of Elkton; JAY T. DEAN;
PHILLIP "RICK" WORKMAN; THEODORE PENCE;
RANDALL L. SNOW, individually and in their
official capacities as Council Members of the
Town of Elkton; RICHARD W. PULLEN,
individually and in his official capacity as
Chief of Police of the Town of Elkton; JOAN
SIGAFOOSE, Executor of the estate of Lucky C.
Sigafoose,

                                        Defendants - Appellees.



———————

Appeal from the United States District Court for the Western
District of Virginia, at Harrisonburg. Glen E. Conrad, District
Judge. (CA-04-30-5)

———————

Argued: May 25, 2006              Decided: July 14, 2006

———————

Before WILKINS, Chief Judge, GREGORY, Circuit Judge, and Joseph F.
ANDERSON, Jr., Chief United States District Judge for the District
of South Carolina, sitting by designation.

———————

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Chief Judge Wilkins and Judge Anderson joined.

**ARGUED:** Timothy Earl Cupp, CUPP & CUPP, Harrisonburg, Virginia, for Appellant.  David Patrick Corrigan, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Richmond, Virginia, for Appellees.  **ON BRIEF:** Jeremy D. Capps, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Richmond, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

GREGORY, Circuit Judge:

David E. Conley brought this action pursuant to 42 U.S.C. § 1983 against the Town of Elkton, Virginia ("Town"), Richard Pullen, the Chief of the Town's Police Department, and six members of the Town's Council ("Council") (collectively "defendants"), asserting that defendants terminated him from the Police Department because he exercised his First Amendment rights. Conley also asserted a pendent state law claim of defamation against Chief Pullen. The district court granted defendants' motion for summary judgment and dismissed Conley's complaint in its entirety. Finding no error in the district court's decision, we now affirm.

I.

The Town has a small Police Department comprised of five officers. Police officers are at-will employees subject to discharge at any time by the Council. In addition, the Town's Code specifically provides that "[t]he Council shall employ police officers or terminate their employment, upon the recommendation of the Chief of Police." J.A. 734.

In September 2000, Conley began working as a police officer in the Town's Police Department. Shortly after Conley was hired, Elkton terminated the police chief, Rob Marshall. Although Conley applied for the position of police chief, the Council offered the position to Richard Pullen.

3

Conley knew Pullen from his previous job in the Page County Police Department. During their employment together, Conley's wife apparently telephoned Pullen's wife in 1992 to inform her that Pullen was engaging in an extramarital affair.[1] During his deposition, Conley opined that "I guess [the telephone call] would cause him to have some animosity toward me." J.A. 195. Nevertheless, Conley attested that he had felt "[e]xcited" that Pullen had received the position as police chief and thought that they could work well together. J.A. 124.

Soon after Conley began working for the Police Department, he earned a reputation as a highly regarded police officer with excellent communication skills. According to Chief Pullen, Conley was more productive than the other officers, adept at solving cases, and proactive in performing volunteer work. Conley was also well-liked within Elkton.

Within the Police Department, however, Conley experienced significant friction with two of the existing officers, Harold Shifflet and John Painter.[2] In early 2001, Officer Shifflet and

---

[1]In fact, Conley himself knew about Pullen's affair and had reported Pullen's conduct to the sheriff at Page County.

[2]Officer Shifflet and Officer Painter initially feared that Conley had been hired to replace Marshall as police chief. In early January 2001, when Pullen assumed his duties as the new police chief, Conley was promoted to the position of Corporal. According to Conley, the other officers (Donald Dean, Shifflet, and Painter) resented his rank. Conley further alleges that he was downgraded four to six weeks later in order "to keep the peace . . . ." J.A. 133.

Officer Painter unsuccessfully propositioned a married woman in the community to entice Conley back to her home "in order to implicate him in improper relations with a woman while on duty." J.A. 720. The woman was "shocked" at the suggestion and instead, informed both Conley and Chief Pullen of the officers' proposal. Id. According to Conley, Chief Pullen did not discipline either Officer Shifflet or Officer Painter for this incident. Ultimately, Officer Shifflet and Officer Painter both resigned from the Police Department in 2001 because of their personal difficulties with Conley.

Conley was also involved in disputes with the other officers. Officer James Morris testified that he noticed that Conley had various "altercations" with Chief Pullen, Sergeant John Atwood, and the other patrol officers. J.A. 303. On one occasion, Officer Rodney Hensley told Chief Pullen that he had "snapped" at Conley when Conley attempted to assist him in a case. J.A. 288. On another occasion, Conley accused Officer Donald Dean of badmouthing him in public, at which point Officer Dean began "screaming and yelling" at Conley. J.A. 145.

In March 2001, Conley confronted Chief Pullen regarding the lack of productivity he perceived within the Police Department. At one point, Conley pointed to the summons log, which recorded the amount of work performed on a monthly basis, and raised his voice at Chief Pullen, claiming that "nobody's not [sic] doing anything."

5

J.A. 135. Conley subsequently received a reprimand for insubordination for his conduct.

Following these incidents, Chief Pullen concluded that Conley was not getting along with the other officers. See J.A. 581 (Pullen, stating that "[i]f it would have been Officer Conley and one particular individual, I would have said, okay, there's [a] personality conflict here, but it was always Officer Conley and someone else; it was Officer [Conley] and John Painter, Officer Conley and Harold Shifflet, Officer Conley and someone else"). Conley admitted that his "fellow officers had trouble getting along with me," J.A. 168, but claimed that any disruptions were minimal because the officers worked different shifts. He further stated that the other officers "had made complaints on me ever since I've been there. They've made it hard on me ever since I been there. They, not me; they." J.A. 169.

In May or June of 2001, the Council called a meeting to address complaints it had received from several officers about Conley. According to Cathy Murphy, a member of the Council, the other officers "did not feel comfortable with Officer Conley, that Officer Conley was overbearing, issuing orders, telling them they weren't doing their job correctly, that he was the best officer." J.A. 343. Despite these complaints, the Council took no action against Conley at that time.

6

Although he had difficulties with his fellow officers, Conley flourished in his volunteer activities with Neighborhood Watch, a seventy-five member organization that focused on improving safety within the Town.  During a Neighborhood Watch program held in the summer of 2002, Conley remarked that a canine unit ("K-9 program") "would be the best drug deterrent in a small town."  J.A. 153. Neighborhood Watch immediately jumped at the suggestion and began fundraising efforts for the K-9 program.

When Neighborhood Watch approached Chief Pullen with the K-9 program, Chief Pullen responded that he would discuss it with the Council.  According to Neighborhood Watch, Chief Pullen represented that he had received approval from the Council to move forward with the K-9 program.  However, after Neighborhood Watch had raised enough money to start the K-9 program, it learned that Chief Pullen had not even spoken with the Council about instituting the K-9 program.  Members of Neighborhood Watch grew angry with Chief Pullen because they believed that he had lied to them.

Chief Pullen did not directly dispute that he misrepresented that he had received approval from the Council.  Rather, Chief Pullen stated that he did inform the Council of the idea, but that the Council had dragged its feet in deciding whether to proceed with the program.  Chief Pullen opined that the K-9 program had created havoc among the community because "Neighborhood Watch was trying to dictate to the town what was to be done with the dog, who

7

was supposed to handle the dog, that sort of thing." J.A. 559-60. Chief Pullen further admitted that he believed that Officer Morris would be a superior K-9 officer based on his physical fitness, but that he felt too much pressure from Neighborhood Watch to support Conley.

Some members of the Council similarly became frustrated with the way in which Neighborhood Watch had thrust the K-9 issue upon them. Indeed, Murphy admitted that the Council felt that the issue had created considerable disruption:

> The havoc was that the canine issue became public really before it came to council for discussion; and what that did, because it was a public issue before it was a council issue to even accept the canine, it put pressure on the chief, it put pressure on the council to accommodate a canine.

J.A. 330. In general, however, the Council supported the K-9 program.

In January 2003, the Council decided to appoint Conley as the K-9 officer. Conley poured a concrete pad at his house for the kennel and prepared for a training session scheduled in March 2003. When Conley and Chief Pullen went to visit the designated K-9 dog, Conley apparently remarked that he did not want to train the dog in cold weather; therefore, Chief Pullen pushed back the training date to the middle of April.

Meanwhile, Conley continued to experience difficulties with his fellow officers. On January 24, 2003, Chief Pullen met with the newly-elected Mayor Wayne E. Printz, Council member Lucky

Sigafoose, Sergeant Atwood, Officer Morris, and Officer Hensley. At this point, Chief Pullen and the other officers expressed that Conley was adversely affecting morale. Chief Pullen further informed Mayor Printz that the officers "were of the impression that Mr. Conley was trying to make himself look great to their detriment." J.A. 512.

In March 2003, Conley met with John Boone, an officer at the Massanutten Police Department, at a restaurant in the Town. During their conversation, Conley told Officer Boone that "there was a lot of people that wanted to see Pullen out the door." J.A. 93. Conley then asked Officer Boone "how much would [he] have to be paid [in terms of] salary to come to Elkton." J.A. 97. When Officer Boone replied, "$33,000," Conley stated, "[t]he Town Council is not going to pay that." J.A. 187. Ultimately, Officer Boone understood Conley to mean that "he was trying to get me to work down there just in case Pullen got fired . . . ." J.A. 97.[3]

At one point during his conversation with Officer Boone, Conley asked a bystander which candidate he would be supporting in the upcoming sheriff's election. When the man responded, "Don Farley," Conley replied, "well, when I get some time and I'm off duty, let me talk to you." J.A. 86-87. Officer Boone understood

---

[3]According to Conley, his recruiting inquiries to Officer Boone and another individual, David Barry (who was an experienced K-9 officer), were "strictly in the essence, if we had openings, that maybe they could come fill those openings." J.A. 187.

9

Conley's comment to express his support for Buddy Farris, the only other candidate running for sheriff.

Because both officers were in uniform at that time, Officer Boone felt nervous that he had violated his department's gag order prohibiting police officers from discussing the sheriff's election during active duty in public. To avoid the appearance of impropriety, he reported the conversation to his supervisor and Chief Pullen. Although Boone told them that Conley "did not openly support Buddy Farris," J.A. 101, Chief Pullen believed that Conley had violated the Police Department's prohibition against police officers supporting political candidates while on duty.

Thereafter, Chief Pullen contacted Murphy and other members of the Council to discuss his recommendation to terminate Conley. According to Chief Pullen, the Council was in agreement to terminate Conley. Chief Pullen believed that "enough was enough, and we should give him the option to resign or be terminated." J.A. 529. Chief Pullen did not, however, discuss the matter with Mayor Printz because, in Chief Pullen's view, "it was obvious that Mayor Printz would not be in favor of [terminating Conley]." J.A. 585.

On April 8, 2003, the Council convened in a special closed session. At the session, Chief Pullen distributed a sheet of paper reciting eight reasons underlying his recommendation to terminate Conley:

10

1.  Enter into conspiracy to disrupt operation of Police Department.
2.  Interfering with cases of other officers.
    395 [Officer Hensley] in court.
    391 [Officer Adam Williams] at Neighborhood Watch.
3.  Participate in political campaigns while on duty.
4.  Failed to take felony warrants to Sheriff's Office on the day told to do so. (02/20/2003).
5.  Becomes defensive when questioned about activities.
6.  On two separate occasions has failed to appear for court cases without proper notification.
7.  Informed in writing that Conley is reluctant to deal with friends and relations.
8.  On three separate occasions Conley has been called before council for altercations with superiors and co-workers.

J.A. 475.

The Council unanimously voted to accept Chief Pullen's recommendation to terminate Conley. At the time of Conley's termination, there were six members on the Council: Jay T. Dean, Cathy Murphy, Theodore Pence, Lucky Sigafoose, Randall L. Snow, and Phillip Workman, II. Each member, with the exception of Sigafoose (who is now deceased), gave differing reasons based on Chief Pullen's list for terminating Conley.

Following his termination, Conley brought suit against defendants, asserting § 1983 claims against the Council related to his termination and a defamation claim against Chief Pullen. Upon defendants' motion for summary judgment on all of Conley's claims, the district court granted the motion and dismissed the complaint. Conley now appeals.

11

II.

A.

We review de novo the district court's decision to grant defendants' motion for summary judgment. Holly Hill Farm Corp. v. United States, 447 F.3d 258, 262 (4th Cir. 2006). According to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Although we view the facts and inferences drawn therefrom in the light most favorable to Conley, the non-moving party, he has the ultimate burden of demonstrating a genuine issue of material fact for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

B.

Conley first asserts that the district court erroneously granted summary judgment with respect to his § 1983 claims regarding (1) his comments concerning the sheriff's election and (2) his association with Neighborhood Watch. We disagree.

The First Amendment "protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." McVey v. Stacy, 157 F.3d

12

271, 277 (4th Cir. 1998).  Protected speech must involve "an issue of social, political, or other interest to a community."  Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (internal quotation marks and citations omitted); Edwards v. City of Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999) (holding that the determination of whether speech is protected rests on "whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee" (internal quotation marks and citations omitted)).  However, even if the speech at issue is protected, an employee's interest "is not absolute and must be tempered by the government's interest in governmental effectiveness, efficiency, order, and the avoidance of disruption."  McVey, 157 F.3d at 277.

In accordance with these principles, a plaintiff claiming retaliatory discharge based on speech protected under the First Amendment must satisfy a three-part test.  First, the speech must implicate a matter of public concern.  Id.  Second, the "employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace."  Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 352 (4th Cir. 2000) (internal quotation marks and citations omitted).  Third, the speech must have been a "substantial factor" in the termination decision.  McVey, 157 F.3d at 278 (internal citations omitted).

13

We first find that the district court properly dismissed Conley's § 1983 claim regarding his comments concerning the sheriff's election. Although Conley's comments regarding the election implicated a matter of public concern, he cannot establish that his right to express those views while in uniform and on duty outweighed the Police Department's interest in maintaining an effective police force. Indeed, as the Tenth Circuit has observed, "public endorsement of candidates by police officers has stirred great controversy within police departments and has detracted from the efficiency and the quality of the services provided by law enforcement." Jantzen v. Hawkins, 188 F.3d 1247, 1258 (10th Cir. 1999) (internal quotation marks and citations omitted) (holding that the police department's interest in providing effective law enforcement outweighed the police officers' free speech interest in running against the sheriff in an election); Horstkoetter v. Dep't of Pub. Safety, 159 F.3d 1265, 1274 (10th Cir. 1998) (finding that Oklahoma's interests in insulating troopers from political pressures, promoting efficiency and harmony amongst troopers, and ensuring that police protection would be available to the public regardless of political affiliations outweighed the troopers' individual rights to display political signs). See also U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 565 (1973) ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is

14

also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded . . . ."). Since the record fails to reflect any further prohibitions on Conley's ability to engage in political activities while off-duty or out of uniform, the Police Department's intrusion on his First Amendment rights, if any, was slight. The Police Department's legitimate interest in insulating itself from political divisiveness within both the Police Department and the community outweighed Conley's right to free speech. Thus, we affirm the district court's decision to grant summary judgment on this claim.

We similarly find that the district court properly dismissed Conley's § 1983 claim regarding his right to associate with Neighborhood Watch. Even assuming that Conley has otherwise satisfied the elements of his claim, Conley failed to establish the requisite causal connection between his association with Neighborhood Watch and his termination--i.e., that his association with Neighborhood Watch was a substantial factor in his termination. As an initial matter, Conley did not present any evidence that the Council ever discussed his association with Neighborhood Watch. In voting to terminate Conley, each member of the Council relied on various justifications--e.g., Conley's altercations with his fellow officers, various acts of insubordination, and conversations concerning the efforts to

15

terminate Chief Pullen--which were wholly unrelated to his association with Neighborhood Watch.  Thus, the Council "would have fired [Conley] even in the absence of the protected speech."  Hall v. Marion Sch. Dist., 31 F.3d 183, 193 (4th Cir. 1994) (internal citations omitted).[4]

Although Conley asserts that his actions were legitimate in each of the cited instances, we note that the Council members "need not have been correct in their apprehension of the facts underlying the articulated justifications."  Goldstein, 218 F.3d at 357. Moreover, even if, as Conley claims, Chief Pullen harbored an unconstitutional retaliatory motive against Conley for his association with Neighborhood Watch, there is no evidence that the Council merely rubber-stamped that reason in terminating Conley. Kirby v. City of Elizabeth City, 388 F.3d 440, 451 (4th Cir. 2004) (no causal connection where the plaintiff failed to "forecast[] evidence that the City Manager approved of retaliation against Kirby as a basis for the demotion").  Accordingly, we conclude that

---

[4]We further note that Conley's argument that the temporal proximity between his activities with Neighborhood Watch and his termination establishes causation is weak.  Conley joined Neighborhood Watch in 2001 (two years before his termination) and suggested the K-9 program in 2002 (one year before his termination).  These events are simply too far removed from his termination to raise a genuine issue of material fact concerning causation.

16

the district court's decision to grant summary judgment on this claim was appropriate.[5]

C.

Conley next contends that the district court erroneously granted summary judgment with respect to his defamation claim. Conley's defamation claim rested on Chief Pullen's recommendation that Conley be terminated because he had conspired to disrupt the Police Department. In dismissing this claim, the district court reasoned that Conley did not present sufficient evidence showing that Chief Pullen acted with the requisite malice in making this statement. We agree with the district court.

Virginia law, which governs Conley's defamation claim,[6] applies a qualified privilege to allegedly defamatory statements made in the context of an employment decision. Union of Needletrades v. Jones, 603 S.E.2d 920, 924 (Va. 2004). As the Supreme Court of Virginia has explained, such statements are protected because they are "'made between persons on a subject in which the persons have an interest or duty.'" Id. (quoting Larimore v. Blaylock, 528 S.E.2d 119, 121 (Va. 2000)). Moreover,

---

[5]We therefore need not reach the issue of qualified immunity discussed by the district court.

[6]See Johnson v. Hugo's Skateway, 974 F.2d 1408, 1416 n.7 (4th Cir. 1992) (a federal court is required to apply state law to pendent state claims brought with § 1983 claims).

the qualified privilege facilitates free discussions between employees and employers because:

> Public policy and the interest of society demand that in cases such as this an employer, or his proper representatives, be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer. There is a privilege on such occasions and a communication made under such circumstances, within the scope of the privilege, without malice in fact, is not actionable, even though the imputation be false, or founded upon erroneous information.

Chesapeake Ferry Co. v. Hudgins, 156 S.E. 429, 441 (Va. 1931).

To overcome the qualified privilege in the employment context, the plaintiff cannot rely on merely showing the falsity of the communication; rather, he must establish that the communication was "inspired by malice." Larimore, 528 S.E.2d at 121 ("The question is not as to the truth or falsity of the communication, or whether the action taken by the defendant with reference thereto or based thereon was right or wrong, but whether the defendant in making the publication acted in good faith or was inspired by malice." (internal citations omitted)). Specifically, the plaintiff must establish common-law malice--i.e., "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." Union of Needletrades, 603 S.E.2d at 924 (internal quotation marks and citations omitted).[7] In

---

[7]As the district court concluded, Conley cannot simply rely on showing that Chief Pullen made the conspiracy accusation with the knowledge that it was false or with reckless disregard for the

18

addition, the plaintiff must prove common-law malice by clear and convincing evidence, which is defined as follows:

> Clear and convincing evidence is that degree of proof which produces in the mind of the trier of facts a firm belief or conviction upon the allegations sought to be established. It is intermediate proof, more than a mere preponderance, but less than proof beyond a reasonable doubt. It does not mean clear and unequivocal.

Se. Tidewater Opportunity Project, Inc. v. Bade, 435 S.E.2d 131, 133-34 (Va. 1993) (internal quotation marks and citations omitted).

The record indicates that Chief Pullen premised his conspiracy accusation on the conversation between Conley and Officer Boone in March 2003. During that conversation, Conley told Officer Boone that a growing alliance sought to terminate Chief Pullen, and subsequently suggested that Officer Boone could switch to the Town's Police Department in the near future. Officer Boone interpreted Conley's comments to mean that "he was trying to get me to work there just in case Pullen got fired . . . ." J.A. 97.

Officer Boone subsequently relayed the substance of this conversation to his supervisor and to Chief Pullen. After learning of the conversation, Chief Pullen believed that Conley had spoken with members of Neighborhood Watch to plot his removal as police chief. Moreover, Chief Pullen determined that Conley's conduct had violated the Police Department's Code of Conduct, which provides, in relevant part, that:

---

truth to overcome the qualified privilege in the employment context. See Union of Needletrades, 603 S.E.2d at 924 n.4.

19

> Any member of the Police Department who enters into a conspiracy, combination, or agreement with the purpose of substantially interfering with or obstructing the efficient conduct or operation of the police force by a strike or other disturbance, shall be guilty of gross neglect of duty, the penalty for which is dismissal.

J.A. 745. Indeed, Chief Pullen expressly relied on the language set forth in the Code of Conduct in characterizing his first reason--"Enter into conspiracy to disrupt operation of Police Department"--for recommending Conley's termination to the Council. J.A. 475.

The circumstances surrounding Chief Pullen's accusation thus establish that he made the accusation in accordance with his good faith belief that Conley had violated the Code of Conduct. See Larimore, 528 S.E.2d at 121 ("The question is not as to the truth or falsity of the communication, or whether the action taken by the defendant with reference thereto or based thereon was right or wrong, but whether the defendant in making the publication acted in good faith or was inspired by malice." (internal citations omitted)). As the district court noted, "[r]ightly or wrongly, Chief Pullen believed that Conley had conspired to get him fired." J.A. 822. Setting aside whether Chief Pullen's determination was actually correct, we perceive no indication that improper considerations such as malice motivated Chief Pullen to make the conspiracy accusation.

Conley nevertheless raises several contentions in support of his view that Chief Pullen acted out of malice. Specifically,

20

Conley maintains that the following establish Chief Pullen's hatred of him: (1) Chief Pullen's failure to substantiate the conspiracy accusation; (2) Chief Pullen's failure to confer with Mayor Printz concerning the recommendation to terminate Conley or to provide Conley with an opportunity to respond to the recommendation; (3) Chief Pullen's desire to protect his own job as police chief; (4) Chief Pullen's resentment toward Conley for his appointment as the K-9 officer; (5) Chief Pullen's failure to discipline Officer Painter and Officer Shifflet for their plot to set up Conley in 2001; and (6) Chief Pullen's anger arising from Conley's wife's disclosure of Chief Pullen's extramarital affair in 1992.

None of these arguments raises a genuine issue of material fact regarding the existence of malice. First, Conley's assertion that Chief Pullen's failure to substantiate the conspiracy accusation demonstrates malice overlooks the fact that Chief Pullen learned of Conley's comments directly from Officer Boone. Significantly, Conley did not proffer any evidence that would cast doubt over Officer Boone's credibility, or would otherwise undermine Chief Pullen's good faith reliance on Officer Boone's account of the conversation. Second, Conley's argument that Chief Pullen circumvented established Town policy by refusing to inform Mayor Printz of the recommendation to terminate Conley prior to the closed session and depriving Conley of an opportunity to respond is flawed. No Town policy or provision entitles Conley to the

21

procedures he seeks.  Third, Chief Pullen's admitted desire to protect his own job is not indicative of personal spite or ill-will against Conley in light of his good faith belief that Conley was attempting to steal his job.  Fourth, Conley's argument that Chief Pullen sought to terminate him as a retaliatory measure for Conley's selection as the K-9 officer amounts to mere speculation and is unsupported by the record.

Finally, the two incidents cited by Conley as indicative of longstanding bad blood between himself and Chief Pullen are too far removed in time from Conley's termination.  As the district court noted, Conley's incident with Officer Painter and Officer Shifflet occurred more than two years prior to Conley's termination, while Conley's wife's disclosure of Chief Pullen's extramarital affair occurred more than ten years prior to the termination.  Moreover, it is undisputed that Conley was "[e]xcited" that Chief Pullen was joining the Police Department, J.A. 124, and that Chief Pullen later commended Conley for his performance in a counterfeiting ring in 2002.  In light of these positive interactions between the two men, we are hard-pressed to infer that Chief Pullen continued to harbor malice toward Conley until his ultimate termination in 2003. See Se. Tidewater Opportunity Project, 435 S.E.2d at 132 (holding that to avoid the privilege, the plaintiff must show "that the words were spoken with malice in fact, actual malice, existing at

22

the time the words were spoken . . . " (internal citations omitted)).

Ultimately, we agree with the district court that Conley has failed to establish, by clear and convincing evidence, that Chief Pullen acted out of personal spite or ill-will in making the conspiracy accusation. Accordingly, we affirm the district court's decision to grant summary judgment on this claim.

## III.

The district court's decision to grant defendants' motion for summary judgment is therefore affirmed.

AFFIRMED